961 A.2d 11 (2008)
404 N.J. Super. 213
Ricki R. ROGERS, Plaintiff-Appellant/Cross-Respondent,
v.
Richard S. GORDON, Defendant-Respondent/Cross-Appellant.
DOCKET NO. A-1531-07T2.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 2008.
Decided December 12, 2008.
*13 Bonnie C. Frost argued the cause for appellant/cross-respondent (Einhorn, Harris, Ascher, Barbarito & Frost, Denville and Charles G. Resnick, Cherry Hill, attorneys; Ms. Frost and Mr. Resnick, on the brief).
Ted M. Rosenberg, Holtsville, NY, argued the cause for respondent/cross-appellant (Mr. Rosenberg and James T. Rosenberg, Willingboro, attorneys and on the brief).
Before Judges WEFING, PARKER and LeWINN.
The opinion of the court was delivered by
PARKER, J.A.D.
On leave granted, the parties cross-appeal from an order entered on October 19, 2007, denying plaintiff's motion for reconsideration of an order entered on July 16, 2007, declaring that a prenuptial agreement entered into by the parties before their 1981 marriage was unconscionable and thereby unenforceable. Both orders were entered after extended plenary hearings. After careful consideration of the cross-appeals, we modify the orders under appeal to the extent that defendant may seek an alimony award if and when he can demonstrate substantially changed circumstances. The remainder of the prenuptial agreement remains in effect.

I
We briefly summarize the facts relevant to this appeal. The parties married on May 16, 1981. At the time of the marriage, plaintiff had graduated from Princeton University and during the marriage she obtained an MBA degree from the Wharton School of Business at the University of Pennsylvania. Defendant had a high school education and was employed by the United States Postal Service (Postal Service) at the time of the marriage. He obtained an associate science degree in physics over a period of nine years during the marriage.
During their twenty-four-year marriage, they had four children, all now emancipated. Shortly before the marriage, they executed a prenuptial agreement (agreement) on May 12, 1981. Their statements of financial condition were appended to the agreement. On June 19, 1987, defendant signed a declaration in which he acknowledged that he was "familiar with the estate plan adopted by" plaintiff and accepted "the provisions" made for him under both the estate plan and the agreement.
From 1977 to 1989, defendant was employed by the Postal Service. In 1990, he left the Postal Service and took a position as a machine operator in plaintiff's father's company, Micro-Tek Corp. (Micro-Tek). *14 Micro-Tek is a small, technical manufacturing company specializing in drawing, stranding and insulating wires.
In January 2002, plaintiff purchased Micro-Tek from her father and defendant served as "plant supervisor" from January 2003 until September 2005. In 2005, defendant's gross income from Micro-Tek was $63,000.[1]
On September 2, 2005, plaintiff filed the complaint for divorce and enforcement of the agreement. Thereafter, defendant's position was changed from a salaried plant supervisor to an hourly machine operator paid at the rate of $32 per hour. Plaintiff's father assumed the job of plant supervisor until his retirement in 2007.
Notwithstanding the pending divorce, the parties continued to live in the same house until December 1, 2006, when defendant was removed by a court order after the court determined that it was in the best interest of the parties' youngest daughter. Defendant's removal was not based on any allegations of domestic violence.
Defendant sought to have the trial court find enforcement of the agreement unconscionable because of the substantial change in his circumstances. According to defendant, the changed circumstances included allegations that (1) defendant had become an at-will employee of plaintiff's company and feared he would be fired upon conclusion of the divorce; (2) he is not qualified to find similar supervisory employment at his $63,000 salary because his work experience is specialized to plaintiff's business and he has limited education; (3) he contributed his "entire paycheck" to the family, but has never controlled any of the family's finances by paying bills, making real estate decisions, paying taxes, planning vacations, paying for schooling costs, insurance, and vehicles; (4) plaintiff has not disclosed the value of her assets, or her true net worth, and defendant is not privy to her records because plaintiff has claimed that a majority of her assets were exempt from disclosure; and (5) plaintiff earns $578,000 while defendant currently earns $63,000.
Defendant argued before the trial court that the agreement should not be enforced because to do so would (1) deny defendant equitable distribution of any asset in plaintiff's name to which he contributed during the marriage; (2) leave defendant with assets only in his name, which pale in comparison to the value of assets in plaintiff's name; and (3) deny defendant alimony.
On February 7, 2007, the trial court began a four-day plenary hearing to determine whether enforcing the agreement would be unconscionable. The trial court rendered a decision on the record and entered an order on July 16, 2007. The court found that enforcement of the agreement would be unconscionable because "it would result in the [d]efendant maintaining a standard of living far below that which was enjoyed during marriage."
Plaintiff moved for reconsideration and on October 19, 2007, after further plenary hearings, the motion was denied. The parties cross-moved for leave to file interlocutory appeals and we granted the motions on November 30, 2007.
In this appeal, plaintiff argues that the trial court erred (1) in finding that unconscionability of the pre-Act[2] agreement *15 should be determined at the time of enforcement rather than at the time of execution; (2) in the application of the unconscionability standard; (3) in failing to consider defendant's pre-marital lifestyle as a factor in its unconscionability determination; (4) in not determining marital lifestyle; (5) in finding that defendant would be fired from plaintiff's company once the final judgment of divorce was entered, that defendant would be unable to secure adequate subsequent employment, and that his projected post-divorce annual budget would be $49,890; and (6) in improperly considering facts not in evidence to arrive at its conclusion.
Defendant contends in his cross-appeal that the trial court erred in failing to include a savings component and only included a small retirement component in its analysis of defendant's post-divorce lifestyle.

II
New Jersey adopted the Uniform Pre-Marital Agreement Act (the Act), N.J.S.A. 37:2-31 to -41, in 1998. The Act expressly applies to agreements "executed on or after" the effective date of the Act and does not, therefore, apply to the parties' 1981 agreement.
In Marschall v. Marschall, 195 N.J.Super. 16, 477 A.2d 833 (Ch.Div.1984), the court distilled the prior case law and held definitively that prenuptial agreements were valid and enforceable and that "[s]uch agreements, subject to [certain] conditions . . . should be welcomed and encouraged." Id. at 28, 477 A.2d 833. The court indicated that principles governing property settlement agreements "should be viewed as equally applicable to antenuptual agreements governing those same issues." Ibid. (citing Petersen v. Petersen, 85 N.J. 638, 645-46, 428 A.2d 1301 (1981)). The "conditions" under which prenuptial agreements would be deemed valid and enforceable evolved into a three prong test: (1) that there be "full disclosure by each party as to his or her financial conditions;" (2) that the party sought to be bound by the agreement understood and accepted the terms and conditions of the agreement; and (3) that the agreement be fair and not unconscionable, that is, that the agreement will not "leave a spouse a public charge or close to it, or. . . provide a standard of living far below that which was enjoyed both before and during the marriage." Id. at 29-31, 477 A.2d 833.
We approved the Chancery Division's "comprehensive exposition and analysis" in D'Onofrio v. D'Onofrio, 200 N.J.Super. 361, 366, 491 A.2d 752 (App.Div.1985). There, we indicated that alimony provisions in prenuptial agreements need not "cover all eventualities, since upon changes in circumstances a spouse may apply to the court for an appropriate modification." Id. at 369-70, 491 A.2d 752 (citing Lepis v. Lepis, 83 N.J. 139, 158, 416 A.2d 45 (1980)). We remanded the matter to the trial court for reconsideration of the agreement because it "provide[d] for no alimony and fail[ed] to establish the standards for plaintiff's continued support." Id. at 370, 491 A.2d 752. We noted, however, that where the agreement provides for
substantial equitable distribution of property and a dependent spouse's own income will be supplemented by unearned income from the investment of the distributed property, a court might determine that . . . the total income of the dependent spouse might be sufficient to maintain her (or him) to the standard of living enjoyed during the marriage.
[Ibid.]

*16 III
After hearing days of testimony from the parties and their experts, the trial court rendered a very extensive and detailed decision on the record of July 16, 2007. The court reviewed the Act, the pre- and post-Act case law and found:
In the present case, the parties were young and without substantial assets at the time of the marriage, but over almost a quarter of a century, circumstances changed significantly. The [c]ourt believes it would simply be absurd to conduct a lifestyle analysis comparing the defendant's lifestyle prior to 1981 versus his [pro]spective lifestyle in 2007.
Secondly, although section C-3 of the Uniform Premarital Agreement Act directs one's attention to the standard of living before the marriage, . . . subsection C-1 adds an element not present in Marschall, which when read in conjunction with C-3 allows the [c]ourt to address the issue of unconscionability by considering the financial position of the spouse requiring support going forward. Clearly, under the Uniform Premarital Agreement Act, passed seven years after the execution of the present ant[e]-nuptial agreement, and remaining in effect. . . require[s] a court of equity to reject those agreements which are unconscionable [and] to assist the [c]ourt in analyzing the significant issue of the case law subsequent to the Uniform Premarital Agreement Act. . . .
. . . .

Jacobitti [v. Jacobitti, 263 N.J.Super. 608, 623 A.2d 794 (App.Div.1993), aff'd, 135 N.J. 571, 641 A.2d 535 (1994)] raises interesting issues with regard to the fact-sensitive nature of enforcement. Apparently, the plaintiff husband was a physician, and at age 60, married the defendant wife who was then approximately 41. The marriage lasted sixteen years, and at the time of divorce, the plaintiff husband was 86, retired and in good health. To the contrary, defendant wife was 67 years old, suffering from progressively deteriorating multiple sclerosis and wheelchair bound.
The Appellate Division affirmed the trial court's conclusion that the ant[e]-nuptial agreement was unenforceable because implementation would be unconscionable, i.e., plaintiff husband would be left a wealthy man and the disabled wife virtually penniless.
Acknowledging this . . . is an extreme situation, the case is illustrative of the principle of changing circumstances and the passage of time as factors to be considered by the court of equity in determining the issue of unconscionability.
. . . .
It is against this backdrop of legal authority that the [c]ourt has to determine whether the ant[e]-nuptial agreement executed in 1981 should be deemed unconscionable in a court of conscience [sic].
. . . .
As of the date of the marriage, plaintiff wife was employed by her father's company and the defendant husband was employed by the United States Postal Service.
The parties maintained a joint account, the so-called CAP account, into which, for the bulk of the marriage, defendant husband deposited his paycheck.
In 1990, the defendant left his secure federal employment without having experienced a meteoric rise through the ranks to assume employment with the plaintiff wife's father's company as a machine operator.

*17 Plaintiff wife purchased Micro-Tek from her father in January 2003, and from January 2003 until September 2005, defendant husband served as the "plant supervisor."
In 2005, the defendant husband's gross salary from Micro-Tek was $63,000.
Following the filing of the complaint for divorce in September 2005, the defendant husband was converted from a salaried employee to an hourly employee with his hourly rate of $32 per hour, determined by plaintiff wife to result in a yearly salary of $63,000 based upon a forty-hour work week.
. . . .
Defendant husband . . . is an at-will employee of a business entity wholly owned by the plaintiff wife. Plaintiff wife is the sole owner of Micro-Tek Industries, having purchased the business from her father in January 2003. The business has been very successful over the years, and although the purchase price was in all likelihood substantial, the question remains unanswered as to whether or not the sale was an arms-length transaction or a partial gift.
. . . .
Defendant husband owns a condominium townhouse which was purchased approximately fifteen years ago in which the defendant husband presently resides after having been removed from the marital home by the [c]ourt in December of 2006.
. . . .
Plaintiff wife resides in the marital residence, which she purchased in January 1983, for $120,000. The mortgage on the property was . . . promptly paid off.
In 1987 and 2000, plaintiff wife utilized home equity loans to pay for the cost of improvements, respectively, in the amount of 100 and $120,000. Both home equity loans were paid off in a relatively short period of time.
Plaintiff wife also owns, without encumbrance, an additional condominium in Palmyra, New Jersey, and a townhouse in Washington, D.C.
[E]mminently qualified experts were employed by both parties to address the employability of the defendant husband post-divorce and to assist the [c]ourt in conducting the lifestyle analysis.
The court reviewed the experts' reports and made a detailed analysis of the parties' expenses. It then considered defendant's income and "dispel[led] . . . the fiction that has been engaged in during the hearing and considered by the experts, i.e., that defendant husband would remain in his present employment post-divorce." The court found that "[t]he proverbial snowball has a greater chance of surviving the flames of Hades," than defendant has of retaining his employment in plaintiff's company.
The court specifically noted that "[t]he [a]ppellate record in this case will never be able to convey the intense feelings of the parties for one another, particularly the feelings of hatred and loathing evidenced by plaintiff wife during her testimony." The court found that plaintiff's "testimony concerning the job security of the defendant husband borders on ludicrous."
The court then addressed defendant's future employability and agreed with the two experts that "[d]efendant husband is capable of obtaining employment as a machine operator earning $30,932 to $37,062" a year. The court reviewed defendant's education and employment history prior to 1990 when he left the Postal Service to work full-time in the family business and found his career "unremarkable." The court concluded that at fifty-three years of age:

*18 Defendant husband's prospects would be further limited by the specialty nature of the work he performed as an employee of Micro-Tek which would present a problem of skill transferability.
The [c]ourt also can make independent findings of fact with regard to the potential employability of the defendant husband in a supervisory capacity based upon having observed the defendant husband testify.
Although perhaps an excellent machine operator, he is inarticulate and seems to have great difficulty even answering the most basic of questions.
In addition, his recall of events and his general awareness of even his present life situation is marginal, at best. Based upon the defendant husband's performance in court, an independent finding can be made by the [c]ourt, he is simply not supervisory material.
Again, the [c]ourt does not seek to embarrass or degrade the defendant husband, but must articulate its observations which are wholly inconsistent with those contained in [plaintiff's expert's] report.
Thus, post-divorce, the [c]ourt finds, following his termination from Micro-Tek, a fai[t] accompli, the defendant husband would be capable of generating an income in the range of $30,932 to $37,062.
The [c]ourt would be remiss if it did not include in the earning potential of defendant husband the funds he has traditionally earned from so-called side jobs.
It is agreed the defendant is good with his hands and has utilized his skills to help others, both for free and for compensation. How much the defendant husband has earned in the past from side jobs is difficult to discern based upon his total lack of record keeping and his inability to provide accurate testimony.
In order to assign a number to the potential income to be generated by side jobs, the [c]ourt will accept, absent proof to the contrary, defendant husband's deposition response that the net profit from his side jobs in 2005 was approximately 4 to $5,000.
There is no reason why the defendant husband could not expect to generate such income post-divorce, in addition to maintaining a full-time position as a machine operator, or the like.
The [c]ourt, having determined the earning capacity of defendant husband, rejecting for the reasons previously set forth, the functional . . . argument of plaintiff wife concerning continued employment, the [c]ourt must now engage in a . . . post-marital lifestyle analysis to determine whether enforcement of the ant[e]-nuptial agreement would result in defendant husband enjoying, once again, a standard of living far below that which was enjoyed both before and . . . during the marriage, quoting Marschall at page 31, 477 A.2d 833.
In conducting this analysis, the [c]ourt deems it unnecessary to compare the before marriage lifestyle with the post-marriage lifestyle, as to do so would border upon the ridiculous as a result of the passage of time.
If the parties had been married for a short period of time, the [c]ourt could conduct such an inquiry, but how does the [c]ourt do so when the premarital lifestyle and the post-marital lifestyle are separated by roughly a quarter of a century? The mere passage of time makes such a comparison meaningless in the eyes of the [c]ourt. Accordingly, the comparison will be with the marital lifestyle and the post-marital lifestyle.
The court found that "the parties chose to live a modest lifestyle . . . during the *19 marriage . . . without incurring any substantial debt." In reviewing the experts' reports, the court noted that after certain adjustments, the experts did not differ substantially with respect to defendant's expenses, and found that defendant needed a post-tax income of $49,890 to meet his minimal expenses for a "significantly reduced lifestyle."
The defendant husband cannot generate sufficient income to sustain the significantly reduced lifestyle represented by a budget of $49,890 per year. And on his adjusted gross income, he would incur significant debt as each year passed, which would shortly place the defendant husband in dire financial straits.
. . . .
One lives a hand to mouth existence when one barely has the income to cover the bare necessities of life. And under the present scenario, defendant husband would not be able to support himself . . . to stay within his financial means, he would have to sacrifice and do without essentials.
A comparison of the secure comfortable lifestyle enjoyed during the marriage, and the hand to mouth existence of defendant husband post-divorce, leads the [c]ourt to conclude, by clear and convincing evidence enforcement of the ant[e]-nuptial would be unconscionable and, thus, the ant[e]-nuptial agreement . . . is unenforceable and is set aside by the Court.
In plaintiff's motion for reconsideration, argued on September 21, 2007, she suggested that the trial court was without jurisdiction to set aside the agreement because the complaint sought only enforcement of equitable distribution issues and the counterclaim sought only support. The trial court rejected that argument because plaintiff claimed that the agreement "circumscribes the parties' entitlement upon divorce." Moreover, the court noted that in the counterclaim defendant sought "equitable distribution of all property acquired during the marriage, as well as spousal support." The motion for reconsideration was denied but the trial court modified its findings regarding defendant's food expenses and passive income.

IV
We are impressed with the detailed and carefully considered analysis undertaken by the trial court in its findings of fact and conclusions of law after the plenary hearings on both motions. The trial court's factual findings and credibility determinations are given great deference, particularly in the Family Part. Cesare v. Cesare, 154 N.J. 394, 413, 713 A.2d 390 (1998). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any deference, however." Manalapan Realty v. Manalapan Tp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995).
Plaintiff first argues that the trial court erred in finding that the unconscionability of the agreement should be determined at the time of enforcement, rather than execution, and incorrectly applied the statutory standard to a pre-Act agreement. She claims that the case law relied on by the trial court dealt with unconscionability in the execution of the agreements, not enforcement. We reject that argument.
The court's entire analysis was based upon changed circumstances, a standard first articulated in the pre-Act Marschall decision and reiterated by us in D'Onofrio, also a pre-Act decision. The trial court looked to the Act and post-Act case law for confirmation and explanation of the pre-Act standard and expressly disregarded those cases that dealt with unconscionability at the time of execution.
*20 The trial court's conclusion that the enforcement of the agreement would be unconscionable is fully supported by the pre-Act case law. D'Onofrio, supra, 200 N.J.Super. at 369-70, 491 A.2d 752; Marschall, supra, 195 N.J.Super. at 28, 477 A.2d 833.
It is the trial court's conclusion to set aside the entire agreement as unenforceable with which we disagree.
In the agreement, the parties acknowledged that plaintiff "is likely to inherit a substantial amount of money and property upon the deaths of her parents." They also acknowledged that each "had the benefit of independent legal advice" and had "been fully advised as to his or her rights hereunder and in the absence of such an agreement, and, with full knowledge of such rights" each was "fully satisfied" to waive such rights and enter the agreement. The parties "each agree[d] that there shall be no property settlement or division of property between them," except for their joint bank account and property acquired during the marriage and held as tenants in common. They each waived any "right, title or interest in (a) the other's income, (b) the other's individual bank accounts . . . or (c) any other assets or property . . . now owned or hereafter acquired . . . whether from . . . income, from gifts . . . as increments to property currently owned or hereafter acquired."
Moreover, they each specifically waived "claims . . . for support, maintenance or alimony," and acknowledged that each is "fully capable of earning and receiving salaries adequate for his and her reasonable needs, and that his and her future prospects for employment are very favorable, and they [are] . . . capable of self-support." Those acknowledgements were made, of course, in 1981 when the parties were in their early twenties and optimistic about their respective futures.
When the parties entered the agreement in 1981, they were fully aware of the disparity in their educations, backgrounds and wealth. In 1987, defendant declared that (1) he was "familiar with the estate plan adopted by" plaintiff, and (2) he "accept[ed] the provisions made for [him] thereunder in full satisfaction of all rights given to me under [the] ante-nuptial agreement, dated May 12, 1981." Thus, defendant essentially reaffirmed the agreement six years after initially entering it.
The trial court's factual findings regarding defendant's change in circumstances are fully supported by the substantial credible evidence in the record. We do not doubt the court's assessment of defendant's limited future with Micro-Tek. Nor do we take issue with the trial court's assessment of defendant's future employment and earning prospects. Defendant's circumstances have already changed with his demotion from a salaried plant supervisor to an hourly-wage machine operator. The trial court found plaintiff incredible with respect to defendant's future employment and determined that his circumstances will change even more substantially after the completion of litigation. Those findings are supported by the record. Nevertheless, defendant's income at Micro-Tek has remained the same and for purposes of assessing alimony, the court cannot determine loss of income prospectively, albeit the evidence supports the likelihood of lost income.
Moreover, we do not find that the evidence or the case law supports setting aside the entire agreement. The agreement provides for defendant to receive equitable distribution of assets acquired during the marriage and held as tenants in common, if there are any such assets. He will also retain all property acquired in his *21 name, including the condominium in which he is now residing.
The agreement defendant executed in 1981 and reaffirmed in 1987 was clear and unequivocal in its declaration that plaintiff would in all likelihood be a wealthy woman and that, in the event of divorce, defendant would not share equally  or even equitably  in that wealth. Under Marschall and D'Onofrio, both pre-Act cases, however, if defendant experiences a substantial change in circumstances from the marital standard of living to the post-marital standard, that would warrant a modification of the agreement to avoid leaving defendant at a subsistence standard of living. The trial court carefully considered the experts' reports on defendant's future earning capability, along with his needs and expenses post-judgment. The court made a credibility finding respecting plaintiff's assertion that defendant would continue his employment post-judgment, which we are not at liberty to reverse. See State v. Locurto, 157 N.J. 463, 470, 724 A.2d 234 (1999). Consequently, we hold that the evidence fully supports a modification of the agreement to the extent that defendant may be entitled to an alimony award if his circumstances are substantially altered. The remainder of the agreement continues in full force and effect.
While we have not addressed each of plaintiff's arguments individually, our discussion incorporates all of the issues she has raised. With respect to defendant's cross-appeal, he argues "defensively" that the trial court did not include in its decision "any savings and only a relatively small retirement component into the budget for his post-divorce lifestyle analysis." (Db 60) Defendant is correct that the court did not include those elements in its analysis. Those elements are subject to a changed circumstances analysis which would, at this juncture, be prospective. As we have indicated, defendant may seek alimony based upon his needs if and when his circumstances substantially change. To date, defendant has suffered only a demotion in status at Micro-Tek, not a diminution of income.
Since this appeal was interlocutory, the matter is returned to the trial court for further proceedings during which the trial court may consider an alimony award to defendant, if and when he presents evidence of changed circumstances.[3] The standard criteria for awarding alimony shall be employed by the court at that juncture.
The orders of July 16 and October 19, 2007 are modified in accordance with this opinion.
NOTES
[1] In his certification, plaintiff stated his Micro-Tek salary was $65,000. Throughout the transcripts, however, his salary is stated as $63,000 and we will use that figure in referring to defendant's salary at Micro-Tek.
[2] The "Act" refers to the Uniform Pre-Marital Agreement Act adopted in 1998.
[3] We note that if defendant voluntarily leaves his employment at Micro-Tek, he may not be eligible for alimony. That issue can be addressed if and when it arises.