**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0631-17T1

DIMITRA KAMBITSIS,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

DEMETRIUS KAMBITSIS,

      Defendant-Appellant/
      Cross-Respondent.

_____

> Argued December 16, 2019 – Decided April 17, 2020
>
> Before Judges Messano and Vernoia.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FM-12-2867-14.
>
> Stephen P. Haller argued the cause for appellant/cross-respondent (Einhorn, Barbarito, Frost & Botwinick, PC, attorneys; Stephen P. Haller and Jennie L. Osborne, of counsel and on the briefs).
>
> Francis W. Donahue argued the cause for respondent/cross-appellant (Donahue, Hagan, Klein & Weisberg, LLC, attorneys; Francis W. Donahue, of

counsel and on the briefs; David S. Mack and Alexis Miriam Miller, on the briefs).

PER CURIAM

In March 2004, while represented by counsel and after exchanging certain financial information, plaintiff Dimitra Kambitsis and defendant Demetrius Kambitsis executed a premarital agreement (PMA). The Case Information Statement (CIS) each supplied to the other, and additional financial data defendant supplied to plaintiff, demonstrated that six months earlier, in September 2003, plaintiff's net worth was $52,197, and defendant's net worth exceeded $21 million.[1] The parties signed the PMA in defense counsel's office with both counsel present, and a court reporter transcribed the proceedings. Plaintiff confirmed that her attorney had repeatedly advised her not to execute the agreement because it was not in her best interest. Nevertheless, plaintiff stated she understood the terms of the PMA, was not under any duress, and wished to proceed.

The PMA specified in pertinent part:

---

[1] Defendant shared a business valuation report prepared by an accounting firm for his company, Raceway Petroleum, Inc. (Raceway), which, along with related companies, defendant owned with his brother. Defendant also supplied his personal 2001 and 2002 tax returns, a statement for a 401k account, and brokerage and bank account statements.

11. (A) The parties acknowledge that the place of their initial contemplated joint residence is owned by [defendant], and that [plaintiff] has no legal or equitable right, title, interest, or claim in or to said property.

. . . .

16. "Termination of marriage" shall mean . . . the . . . [f]iling of a [c]omplaint for [d]ivorce . . . .

. . . .

18. . . . The parties have agreed that no temporary, pendente lite, term, rehabilitative, "permanent" or other alimony or spousal support or maintenance . . . shall be sought by [plaintiff] or in any form or fashion paid by [defendant] to [plaintiff]. In reaching this Agreement, the parties have considered the following foreseeable circumstances (and have waived the effects of any unforeseen circumstances):

  (a) [i]ncreases or decreases in their income;
  (b) [t]heir loss or inability to secure employment;
  (c) [a]ny prospective loss of, change in status, or change of employment;
  (d) [l]oss of separate property;
  (e) [d]issipation of separate property, for whatever cause;
  (f) [t]he existence of any child or children of the marriage;
  (g) [a]ny other event that may or does change the quality of their economic lives.

  . . . .

3

20. [Plaintiff] further warrants and represents that her premarital standard of living was modest . . . and can fully be funded now, and in the future, by the use of her personal income from all sources, as well as other assets and income from various and diverse members of her family. She further agrees that she does not require, and shall not accept, funds or support from [defendant] under any circumstances, in the event of termination of the marriage.

21. In the event that the marriage terminates after the birth of children, the parties agree, understand and acknowledge that both shall have an obligation to contribute to the support and welfare of those children. The parties agree that New Jersey Law regarding support of the children shall prevail, however, [plaintiff] explicitly agrees that she shall not plead the provisions of this Agreement, or the terms thereof, in any effort to obtain child support payments from [defendant] which would exceed any applicable guidelines in the recognition that she has, and accepts, a co-equal obligation for the financial welfare of any children of the marriage.

. . . .

23. (b) In the event the marriage terminates with surviving children born to the parties:

(1) Upon the birth of the first child, [defendant] shall purchase a $1 million term life insurance policy on his life, [plaintiff] would be the beneficiary of the insurance policy, which she shall be obliged to use to provide for the benefit of any children of the marriage.

. . . .

4

(6) [Defendant] agrees to execute a Last Will & Testament leaving to the children of the marriage, share and share alike, 28% of his estate, naming [plaintiff] as the Trustee of the inheritance for any unemancipated child. The remaining 72% of [defendant's] estate can be divided as he sees fit, and [plaintiff] waives all right, title and interest in and to that portion of his estate, including any "forced share" or other such inheritance rights.

24. . . . Each party waives and relinquishes all rights now held or hereafter acquired under the laws of any jurisdiction to share in the separate property and estate of the other as a result of the marital relationship, including, but not limited to, dower, curtesy, equitable distribution, statutory allowances, widow(er)'s share/allowance, homestead rights, rights under intestacy, "forced share," right to act as administrator/executor/trix, and any community property rights. (citation omitted).

. . . .

27. Each party has executed this Agreement freely, voluntarily, without persuasion, fraud, undue influence or economic, physical or emotional duress. . . . Moreover, the disparity between the total value of the assets owned by the parties is considered by them to be of no consequence.

. . . .

35. Each party shall pay her and his own legal fees in the negotiation and preparation/execution of this Agreement. A party who fails to abide by the terms of

5

> this Agreement shall indemnify the other party for all reasonable costs and expenses, including professional fees, incurred in enforcing this Agreement or asserting or defending his or her rights hereunder as against the other party or third parties.

Additionally, the PMA provided that if the marriage "terminate[d] with surviving children" after lasting "more than ten, but less than twenty-five years," defendant agreed to provide plaintiff with: (1) a lump sum payment of $145,000; (2) thirty-six months of health insurance (eighteen months through COBRA and eighteen months through a private HMO); (3) a "contribution . . . not to exceed $250,000[]" towards the purchase of a 3000 square foot home in Middlesex County that was "reasonably acceptable to [plaintiff]"; and (4) a "contribution . . . not [to] exceed $30,000[]" towards the purchase of an automobile. Other provisions of the PMA stated that plaintiff had no claim to: (1) defendant's separate premarital property; (2) property of any kind acquired during the marriage solely in defendant's name; or (3) any increase in value of any pension, deferred compensation, 401k, retirement, profit sharing, or IRA acquired by defendant before and during the marriage, and to any of the above acquired during the marriage in defendant's name alone.

The parties married in May 2004 and moved into a home which defendant purchased in his name for $615,000 in cash. Five children were born between

2005 and 2010. In 2012, defendant purchased a home in his own name for $1.57 million in cash. Although the parties intended to move there, from 2012 to 2014 they essentially used only the pool and pool house. Defendant purchased a vacant school building in the same town through one of their companies in 2011, and the family used the gymnasium and art room in the building.

Meanwhile, in 2007, the parties executed an amendment to the PMA during another transcribed signing ceremony at defense counsel's office. The amendment included plaintiff's specific acknowledgment that she was under no duress, had chosen to proceed without an attorney, was not represented by defense counsel, and her waiver of representation would "not act to impair or invalidate" the PMA as amended.

The amendment deleted Paragraph 23(b)(1) of the PMA and provided:

> 6. In place of Paragraph 23(b)(1) . . . the following provision is inserted:
>
> "23(b) [Defendant] shall further provide life insurance as follows:
>
> (1) Since children have been born to the parties, [defendant] shall immediately secure a minimum of $1,000,000[] . . . life insurance on his life, (or, in his sole discretion make the existing children, and any future children, the joint equal beneficiaries of that total amount from his estate). This amount shall be payable to a separate Trust for the benefit of all the children during the period of their minority, with [plaintiff]

7

named as the Trustee thereof. The "Trust" mentioned in this sub-paragraph is and shall be separate and apart from any other formal Trust created by [defendant] for any children born of the marriage. This $1,000,000[] policy/estate entitlement is a total amount for all children, irrespective of the number of children born to the parties. In addition, during the marriage and only during the marriage, [defendant] shall maintain $1,000,000[] . . . of insurance on his life payable to [plaintiff] in place of all other life insurance required of him in the [PMA] between the parties (or, in his sole discretion he may make [plaintiff] the beneficiary of that amount from his estate). [Defendant] shall have no other enforceable life insurance obligation except as explicitly set forth in this [p]aragraph."

7. Paragraph 23(b)(6) is hereby deleted.

Plaintiff filed for divorce in 2014, defendant filed an answer and counterclaim, and both filed CISs. Plaintiff claimed little or no knowledge of the parties' shelter expenses or assets but estimated monthly personal expenses of $13,391. Defendant did not state the value of the real estate he owned in his name, the vehicles owned by the parties, or the surrender value of his life insurance; he estimated the shelter, transportation and personal expenses of the family to be $11,510 per month. Defendant identified ten other businesses in which he held interests, a 401k, and an investment account in his name, but he assigned no values to these. Defendant also disclosed ownership of certificates of deposit and bank accounts totaling nearly $800,000. He said that Raceway

A-0631-17T1

had outstanding loans and accounts payable, which he had personally guaranteed amounting to approximately $21 million.

In an October 2014 order, the judge awarded plaintiff various pendente lite relief, and also granted defendant's request to conduct a plenary hearing on the enforceability of the PMA.[2] Motion practice continued thereafter unabated, but most of the issues raised at this point in the litigation are not relevant for our purposes.

The plenary hearing took place between February and April 2016, at which plaintiff and defendant testified about their relationship leading up to execution of the PMA.[3] In her August 18, 2016 order (the August 2016 order) and accompanying statement of reasons, which we discuss more fully below, the hearing judge determined the PMA was enforceable, defendant had no alimony obligation to plaintiff, and he was not required to pay plaintiff any more than a lump sum of $145,000. The order provided that the ruling as to the enforceability of the PMA "shall not be disturbed by the [c]ourt at a later

---

[2] For the balance of the opinion, we refer to the PMA and the amendment as the PMA.

[3] The only other witness was a clergyman who refuted plaintiff's claim that she had made plans for an earlier wedding but had to cancel them when defendant insisted on executing a premarital agreement.

A-0631-17T1

hearing." The order further required defendant to pay plaintiff's counsel fees, which award "represent[ed] a final determination on the issue of counsel fee payments for the enforceability of the parties' [PMA.]"

The judge also ordered that the amount of defendant's child support obligation and his responsibility to maintain life insurance for the children's benefit would be determined at a later hearing. Contrary to the provisions of the PMA, the judge did not place a $1 million limit on any potential policy ordered in the future. The order also vacated the PMA's provisions regarding defendant's contributions toward the purchases of a new home and automobile for plaintiff and said, instead, that defendant's obligations in this regard would be determined at a later hearing.

Plaintiff and defendant filed an updated CIS prior to the trial that took place on all remaining issues and over which a different judge presided. We need not recount the testimony in detail at this point. The pertinent provisions of the August 2017 final dual judgment of divorce (JOD) provided:

> 5. Commencing in 2018, each party shall also be entitled to two (2) weeks of vacation time with the children per year, to be exercised non-consecutively, with the parties to provide a minimum of [thirty] days of advance notice to each other. . . . The party having priority in any given year shall advise the other of their vacation parenting time in writing by April 1. The party not having priority shall notify the other party in

writing by May 1. . . . There is no prohibition on "tacking" vacation time on to regular parenting time (e.g.[,] scheduling a week of vacation which adjoins that party's parenting time, thus giving a party more than [seven] consecutive days with the children).

. . . .

7.  The defendant shall pay the plaintiff child support . . . in the sum of [$8186] per month, payable at the rate of [$1889] per week commencing upon entry of this [JOD].

. . . .

9.  The [defendant] shall contribute up to $675,000[] toward the purchase of a home for the plaintiff.  This sum shall be placed in escrow by the defendant . . . within 60 days.  That $675,000[] maximum obligation may be used by the plaintiff for the sale price, including all necessary and customary closing costs.  Any amount . . . in excess of the sale price and all necessary and customary closing costs after closing shall be retained by the defendant.

. . . .

11.  The defendant shall contribute up to $40,000[] toward the purchase of a vehicle for the plaintiff.  The defendant shall place this sum in escrow . . . within 60 days.  The plaintiff shall purchase said vehicle within 90 days.  Upon doing so, she shall return the vehicle currently in her possession to the defendant as it is the [c]ourt's understanding that she currently drives one of his vehicles.  Any excess above the $40,000[] not used for said vehicle shall be . . . returned to the defendant.

A-0631-17T1

12. Defendant shall provide health insurance for plaintiff for [thirty-six] months; [eighteen] months through COBRA and an additional [eighteen] months through a private HMO policy. This obligation to maintain medical insurance as provided in the [PMA] shall commence upon entry of the [JOD].

. . . .

14. The defendant shall maintain $2,750,000[] in life insurance for the benefit of the minor children until emancipation. This coverage can be reduced by $550,000[] upon the emancipation of each of the five (5) children. The plaintiff shall be designated as trustee for the funds to be used for the benefit of the children.

15. The defendant shall pay the plaintiff counsel fees in the sum of $225,000[]. This sum shall be paid from defendant to plaintiff within 60 days . . . .

Defendant filed his appeal, and plaintiff cross appealed.

Defendant then moved in the trial court for a stay of paragraphs nine, eleven and fifteen of the JOD, which required him to pay $940,000 toward the purchase of plaintiff's new home and car, and the award of counsel fees within sixty days. Plaintiff filed a cross-motion seeking enforcement of the child support and the travel provisions of the JOD.

At the conclusion of the October 27, 2017 hearing on the cross-motions, the judge entered an order (the October 27 order) denying defendant's motion for a stay and granting in part plaintiff's enforcement motion. In paragraph four

of the order, the judge agreed that the child support awarded under the JOD only satisfied the children's needs when they were with plaintiff, and "each party [was] responsible for satisfying expenses the children incur during their respective parenting time[.]" In paragraph five, the judge also "enforce[d]" and "clarif[ied]" the parenting time provisions of the JOD, such that "if either party [were] taking any of the children out of the tri-state area or traveling by plane, that party shall notify the other, in advance, and provide a complete itinerary." Lastly, in paragraph six, because of defendant's bad faith in seeking a stay, the judge also ordered defendant to pay plaintiff's counsel fees in the amount of $13,301.

We denied defendant's application for a stay on an emergent basis. He filed a formal motion for a stay, which was considered by our court and denied in the normal course. Defendant filed an amended notice of appeal challenging paragraphs four, five, and six of the October 2017 order.

I.

As to each and every portion of the JOD discussed above, defendant contends that the trial court misapplied the law, abused its discretion, or both. Succinctly stated, as to the financial provisions of the JOD, defendant claims the trial judge awarded plaintiff alimony through the "back door." As to the October

2017 order, defendant contends the judge abused his discretion and, regarding the award of counsel fees, defendant asserts the judge made "insufficient and improper findings of fact upon which" to base the award. In the event we reverse and remand on any issue, defendant urges us to order that a different judge conduct the hearing.

Plaintiff opposes the arguments raised by defendant, and, in her cross-appeal, contends the "substantial credible evidence in the record does not support the enforcement of plaintiff's alimony waiver." Plaintiff argues that reversal of those provisions of the August 2016 order that enforced the alimony waiver in the PMA compels only a remand "for limited discovery and determination of a fair award of limited duration alimony." She also argues that the elimination of paragraph 23(b)(6) of the original PMA, which obligated defendant to bequeath 28% of his estate to the children, violated public policy and lacked any consideration. Plaintiff also contends those provisions of paragraph fourteen of the JOD, which permitted reduction of defendant's life insurance obligations upon emancipation of each child, must be set aside because the PMA provided for no such reduction.

In opposition to the cross-appeal, defendant contends the August 2016 order was a final order, appealable as of right, and, therefore, plaintiff's

challenge is untimely. We reject that argument out of hand. "Appeals as of right from the Superior Court generally may be taken only from final judgments." Huny & BH Assocs. Inc. v. Silberberg, 447 N.J. Super. 606, 609 (App. Div. 2016) (citing R. 2:2-3(a)(1)). "Final judgments are those that adjudicate 'all issues as to all parties.'" Ibid. (quoting Silviera-Francisco v. Bd. of Educ. of Elizabeth, 224 N.J. 126, 136 (2016)). It is obvious that the August 2016 order did not adjudicate all issues as to the parties and specifically required further proceedings resulting in the JOD. In any event, defendant argues plaintiff failed to demonstrate the PMA was "unenforceable," the elimination of the children's inheritance did not violate public policy, and the reduction of life insurance upon each child's emancipation was appropriate.

Because it impacts all that follows, we consider plaintiff's cross-appeal first.

## A.

In her August 18, 2016 opinion following the plenary hearing on the enforceability of the PMA, the judge found defendant credibly testified that he never would have married without a PMA, and that he discussed this fully with plaintiff. The judge was persuaded that defendant's brother, who, according to defendant, controlled much of the businesses' operations, had a great deal of

15

influence over defendant. On the other hand, the judge rejected plaintiff's testimony that defendant told her the PMA only dealt with Raceway, or that defendant "blindsided her" when he confronted her with the PMA. Although the judge accepted plaintiff's testimony that defendant paid for her lawyer to negotiate and advise her about the PMA, the judge noted that the attorney successfully effectuated changes to the agreement proposed by plaintiff. In the judge's view, plaintiff's "demonstrable effort[s] to disingenuously dramatize her story" with "falsifications" about wedding plans essentially eliminated duress as a possible reason to invalidate the PMA.

Noting that testimony from an expert would have been helpful, the judge expressed doubt about plaintiff's medical conditions and purported lack of employability. The judge concluded:

> In view of the other provisions [in the PMA], [p]laintiff had not specifically demonstrated how the waiver of alimony, in all contexts, subsequent to the parties' divorce would be an unconscionable provision. By clear and convincing evidence, [p]laintiff has not shown the [PMA] would only be conscionable — or would not be unconscionable — if she were to receive alimony. . . . [T]he [PMA] provides for her and the . . . children through other means, such that the specific waiver of alimony, a provision expressly agreed upon by the parties, is not unconscionable. Moreover, [p]laintiff has not demonstrated by clear and convincing evidence that she cannot financially support herself and provide for herself alone. Plaintiff is

16

certainly entitled to receive child support for the benefit of the <u>children</u> . . . but this [c]ourt will not reward what so clearly appears to be [p]laintiff's willful unemployment . . . .

Later in her decision, the judge again commented on plaintiff's lack of employment:

Only at [a later hearing when defendant's child support obligation is determined] will the merits of [p]laintiff's level of employment, despite sharing equal parenting time of the children with [defendant], be ripe for adjudication. It is true that [p]laintiff is and has been unemployed, but she has not shown by clear and convincing evidence that she has no ability to work, earn an income, or support herself in any way[,] shape or form. It is also clear that by virtue of her work experience and recent absence from the job market that she would not be capable of earning an income comparable to that of [d]efendant. But the disparity in the parties' income does not relieve her of any responsibility to provide financial support for herself. Her salary and income may pale in comparison to [d]efendant, but her willful unemployment shall not be rewarded by the receipt of extra financial support from [d]efendant beyond an incidental benefit she may receive from [d]efendant's child support obligation in support of the parties' children. At a final hearing, the [c]ourt shall take a hard look at the parties' circumstances, including all financial determinations therein providing money or other assets to [p]laintiff, and carefully calculate [d]efendant's child support obligation so as to avoid a situation wherein child support serves as "back door alimony" beyond the extent of an incidental benefit permitted by law.

Even though the judge upheld the alimony waiver in the PMA, she nonetheless concluded "[t]he bottom[]line is that in order to avoid an unconscionable result, [p]laintiff requires more financial support than what is granted to her under the [PMA] . . . for the benefit of the children."

The judge cited N.J.S.A. 37:2-32(c), which, when the PMA was executed and amended, defined an "[u]nconscionable premarital agreement" as

> an agreement, either due to a lack of property or unemployability:
>
> (1) Which would render a spouse without a means of reasonable support;
>
> (2) Which would make a spouse a public charge; or
>
> (3) Which would provide a standard of living far below that which was enjoyed before the marriage.[4]

[4] "New Jersey adopted the Uniform Pre-Marital Agreement Act (the Act), N.J.S.A. 37:2-31 to -41, in 1988." Rogers v. Gordon, 404 N.J. Super. 213, 219 (App. Div. 2008). A 2013 amendment to the Act eliminated N.J.S.A. 37:2-32(c). See L. 2013, c. 72, § 1. The amendment applied only to those agreements entered into, or amended, after the legislation's effective date, June 27, 2013. L. 2013, c. 72, § 3.

Both parties seemingly accept, as did the judge, that the pre-amendment Act applied. This is consistent with the express language of the amendment, and the Legislature's intent. See N.J. Comm., Statement to S. 2151 n.3 (March 21, 2013) ("premarital . . . agreements entered into before the effective date would remain subject to the current law, which permits agreements to be set aside if deemed, at the time of enforcement, to be unconscionable").

The judge imputed income of $15,000 to plaintiff, assumed the $145,000 plaintiff would receive under the PMA would be quickly exhausted, and given the uncertainty about the amount of any child support award, determined that even though the PMA obligated defendant to pay for plaintiff's house and car, plaintiff would soon become impoverished. The judge specifically found plaintiff would experience "'a standard of living far below that which was enjoyed before the marriage' or . . . [be] left 'without a means of reasonable support.'" (quoting ibid.). Accordingly, the hearing judge decided to "rescue" the PMA from unconscionability by reforming some of its provisions. She decided that defendant's financial contributions towards plaintiff's home and car would be "ascertained at a final hearing" taking into account plaintiff's total financial circumstances.

The trial judge ultimately imputed income of $17,555 per annum to plaintiff after considering her education, prior work experience, past income and then part-time position working at the children's school. In his written decision, the trial judge noted that defendant's income was 99.9999% of the parties' combined income. Even defendant acknowledged during trial that plaintiff was not capable of earning much more than $16,000 per year. Meanwhile, Raceway's accountant testified at trial that defendant's personal brokerage

19

account was worth approximately $21 million as of May 2017. He estimated that another account owned by an LLC, in which defendant was an equal partner with his brother, was worth approximately $32 million in 2015.

B.

We generally defer to factual findings made by a trial court when such findings are supported by adequate, substantial, and credible evidence. Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We review the Family Part judge's findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282–83 (2016) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). This is particularly so where the evidence is largely testimonial and rests on the judge's credibility determinations. Gnall, 222 N.J. at 428. "A more exacting standard governs our review of the trial court's legal conclusions[,] . . . [which] we review . . . de novo." Thieme, 227 N.J. at 283 (citing D.W. v. R.W., 212 N.J. 232, 245–46 (2012)).

"Pre-nuptial agreements establishing post-divorce obligations and rights should be held valid and enforceable." Hawxhurst v. Hawxhurst, 318 N.J. Super. 72, 80 (App. Div. 1998) (citing Marschall v. Marschall, 195 N.J. Super. 16, 27 (Ch. Div. 1984)). "These contracts should be encouraged by the courts

'at least "to the extent that the parties have developed comprehensive and particularized agreements responsive to their peculiar circumstances."'" Ibid. (quoting D'Onofrio v. D'Onofrio, 200 N.J. Super. 361, 366 (App. Div. 1985)). "[S]imply because a spouse receives a disproportionate amount of assets does not necessarily render an agreement voidable because it is for the parties themselves to decide what is fair and equitable." Ibid. (citing DeLorean v. DeLorean, 211 N.J. Super. 432, 437 (Ch. Div. 1986)). In Rogers, we later summarized some basic principles governing review of PMAs:

> The "conditions" under which prenuptial agreements would be deemed valid and enforceable evolved into a three prong test: (1) that there be "full disclosure by each party as to his or her financial conditions;" (2) that the party sought to be bound by the agreement understood and accepted the terms and conditions of the agreement; and (3) that the agreement be fair and not unconscionable, that is, that the agreement will not "leave a spouse a public charge or close to it, or … provide a standard of living far below that which was enjoyed both before and during the marriage."
>
> [404 N.J. Super. at 219 (quoting Marschall, 195 N.J. Super. at 29–31).]

As already noted, when the parties entered into the PMA, N.J.S.A. 37:2-32(c) defined an unconscionable agreement as one that "render[ed] a spouse without a means of reasonable support[,] . . . would make a spouse a public

21

charge[,] or . . . would provide a standard of living below that which was enjoyed before the marriage." The Act further provided:

> A premarital . . . agreement shall not be enforceable if the party seeking to set aside the agreement proves, by clear and convincing evidence, that:
>
> . . . .
>
> b. The agreement was unconscionable at the time enforcement was sought; or
>
> . . . .
>
> d. The issue of unconscionability of a premarital . . . agreement . . . shall be determined by the court as a matter of law. [5]

> [N.J.S.A. 37:2–38 (2007).]

The hearing judge found that at the time of enforcement, the PMA as executed would leave plaintiff with a standard of living below what she enjoyed before the marriage and without a reasonable means for support. Rather than declaring the PMA unenforceable, the judge embarked on a "rescue" mission. She decided to leave the alimony waiver intact and overcome the unenforceable nature of the PMA as executed by postponing resolution of essentially all other financial

---

5 The 2013 amendment to the Act deleted subsection (b).

issues through possible revisions of other provisions of the PMA after a later trial.

In Rogers, we recognized that a finding of unconscionability does not compel scrapping an entire PMA. 404 N.J. Super. at 225. In that case, we noted that under the PMA and its later amendment, the defendant-husband would receive "equitable distribution of assets acquired during the marriage[,]" and real property he obtained in his own name, including the condominium in which he resided. Id. at 227. Nevertheless, given the defendant's "substantially altered" employment circumstances from his pre-marital status, we affirmed setting aside the alimony waiver provisions of the PMA and left the "remainder of the agreement . . . in full force and effect." Ibid.

Here, although plaintiff's employment circumstances changed little from those that existed prior to execution of the PMA, undeniably there were significant changes from the date of the marriage. The parties had five children in less than six years, the oldest of which was only nine when the divorce complaint was filed. Plaintiff literally acquired no assets during the marriage, while defendant's assets and wealth continued to increase by leaps and bounds. In Rogers, we noted "that alimony provisions in prenuptial agreements need not 'cover all eventualities, since upon changes in circumstances a spouse may apply

to the court for an appropriate modification.'" Id. at 219–20 (quoting D'Onofrio, 200 N.J. Super. at 369–70). In this case, the PMA was unconscionable when defendant sought to enforce its alimony waiver and other provisions because there was no correlation between the terms of the agreement and plaintiff's ever-increasing economic dependence. Furthermore, the hearing judge's attempts to "rescue" the PMA by leaving for another day consideration of other financial questions failed to salvage the unconscionability of the agreement.

The trial judge followed the terms of the PMA and awarded plaintiff no share of the assets that defendant acquired during the course of this ten-year marriage. Instead, the judge tried to overcome the inherently unconscionable nature of the agreement by amending those provisions which the hearing judge had earlier left undecided. Defendant's primary assertion on appeal is ironically correct: the disputed provisions of the JOD were attempts to provide some level of economic fairness — defendant argues alimony — through "the back door."

"Alimony is a claim arising upon divorce, which is rooted in the prior interdependence occurring during the parties' marital relationship. '[A]limony is neither a punishment for the payor nor a reward for the payee.'" Reese v. Weis, 430 N.J. Super. 552, 569 (App. Div. 2013) (alteration in original) (quoting Mani v. Mani, 183 N.J. 70, 80 (2005)). The bottom line following the trial judge's

efforts to rectify the drastic, unconscionable financial imbalance between the parties at the time they executed the PMA, and which only increased during the marriage, was a one-time infusion for plaintiff's benefit of $435,000 more than provided to her under the terms of the PMA: $10,000 more for her car and $425,000 more for a home for her and the children. We conclude that the trial judge's efforts were inadequate.

We reverse paragraph 1(a) of the August 2016 order that upheld the alimony waiver in the PMA. We remand the matter for further proceedings consistent with this and the balance of this opinion. In doing so, the remand judge may of course consider the effect, if any, of paragraph 1(c) of the August 2016 order, which resulted in a lump sum payment to plaintiff of $145,000 in accordance with the terms of the PMA. We next consider the further effect of our holding.

C.

Plaintiff argues that any remand can be limited to discovery and a plenary hearing as to an appropriate alimony award.[6] We conclude that the remand cannot be so limited.

---

[6] Plaintiff also argues that the trial judge erroneously amended the PMA to permit defendant to reduce his life insurance policy limits upon the

Our courts have long recognized the interrelationship between alimony and other financial issues posed by the dissolution of any marriage. See, e.g., Steneken v. Steneken, 183 N.J. 290, 299–300 (2005) ("[A]limony and equitable distribution are separate yet interrelated and ultimately subject to an overriding sense of fairness . . . buttressed by our statutory scheme, where the separate powers to award alimony and determine equitable distribution are codified."); Brown v. Brown, 348 N.J. Super. 466, 475 (App. Div. 2002) (recognizing "the interrelationship of equitable distribution, alimony, child support, and fee awards"); N.J.S.A. 2A:34-23(a) (listing factors to consider in awarding child support, including, in subsection (2), the "[s]tandard of living and economic circumstances of each parent"); N.J.S.A. 2A:34-23(b) (listing factors to consider in awarding of alimony).

The inescapable conclusion is that contrary to plaintiff's assertion, the remand hearing cannot be limited solely to the issue of whether she is entitled

---

emancipation of each child. We address that in the context of our holding in this subsection. We discuss in a separate subsection below plaintiff's ancillary argument, i.e., that the elimination of the children's forced share of defendant's estate, paragraph 23(b)(6) of the original PMA, is void as against public policy.

to alimony, and, if so, its amount and duration.[7] Consideration of a just, fair, and equitable alimony award must, by its nature, consider other financial circumstances and needs. Simply put, we are unable to affirm or reverse on the merits other aspects of the JOD challenged by defendant in light of our holding. The wisest course requires us to permit the remand court to vacate or modify as necessary paragraphs seven, nine, eleven, twelve, and fourteen of the JOD pending full consideration of all financial issues.

We reject, therefore, plaintiff's facial challenge to paragraph fourteen of the JOD, which permits defendant to reduce his life insurance obligations as each child became emancipated, as being beyond the express terms of the PMA. Obviously, "[l]ife insurance policies or trusts are frequently included in final judgments of divorce as security for support obligations." Claffey v. Claffey, 360 N.J. Super. 240, 263 (App. Div. 2003) (citing Jacobitti v. Jacobitti, 135 N.J. 571, 574–75 (1994)). Because we hazard no prediction about the composite financial picture of the parties following remand, we leave that court free to fashion an appropriate surety for defendant's obligations.

---

[7] Because the issue was not addressed by either party, we specifically do not consider application of the 2014 revisions to the alimony statute and whether they apply to the particular circumstances of this case. See, e.g., Landers v. Landers, 444 N.J. Super. 315, 322–24 (App. Div. 2016). The issue is better left for the remand judge's consideration.

27

As to defendant's challenge to paragraph fifteen of the JOD awarding plaintiff counsel fees, the arguments made lack sufficient merit to warrant extensive discussion in a written opinion. R. 2:11-3(e)(1)(E). We find no mistaken exercise of the judge's discretion. R. 5:3-5(c); Eaton v. Grau, 368 N.J. Super. 215, 225 (App. Div. 2004). We affirm that portion of the JOD, without prejudice to the remand judge considering the award, and the prior award to plaintiff following the plenary hearing, in fashioning a just, fair and equitable resolution of all financial issues.

Additionally, we reject defendant's argument that a different judge must preside over the remand. We find no merit to defendant's claim of bias, or that the same judge would be in an "untenable" position if required to reconsider any issue previously decided. Luedtke v. Shobert, 342 N.J. Super. 202, 219 (App. Div. 2001).

D.

Plaintiff's other argument raised by cross-appeal is that the elimination of paragraph 23(b)(6) of the PMA as a result of the 2007 amendment was void as against public policy, because the parties were not free to bargain away the inheritance rights of their children, who did not receive any consideration in return. The cases cited by plaintiff in support of her argument are inapposite,

since they all deal with a well-recognized principle, i.e., the right to support "belongs to the child, not the custodial parent. . . . [P]arents [may not] bargain[] away the essential rights of their sons and daughters, including the right to be properly supported." Patetta v. Patetta, 358 N.J. Super. 90, 94 (App. Div. 2003) (citing Pascale v. Pascale, 140 N.J. 583, 591 (1995); Blum v. Ader, 279 N.J. Super. 1, 4 (App. Div. 1994)).

None of the cases cited by plaintiff stand for the proposition that one of the parties to a PMA or other marital agreement must accommodate the potential needs of his or her children by a bequest from his or her estate. For example, plaintiff cites Kiken v. Kiken, 149 N.J. 441 (1997), as authority. However, in that case, citing N.J.S.A. 2A:34-23(a), the Court affirmed the Family Part's order directing the deceased husband's estate to contribute to the costs of his son's college education, stating only "[n]othing in the statute prevents courts from entering such orders after the death of a parent." Id. at 453; accord Fazilat v. Feldstein, 180 N.J. 74, 81 (2004).

More on point is dicta in our decision in Koidl v. Schreiber, where we rejected the father's estate's claim that a post-death order continuing child support in the absence of a testamentary bequest "amount[ed] to an overturning of the will." 214 N.J. Super. 513, 516 (App. Div. 1986). We noted that while

29

"[s]urviving children have not been given the protection of an elective share[,]" the children did "not claim a right under the will[.] . . . [T]hey assert[ed] a continuing dependency claim against the estate." Ibid. We concluded the trial court had the right "to continue support payments after the death of the parent." Ibid.

In short, plaintiff cites no authority for her argument that the elimination of paragraph 23(b)(6) from the original PMA by way of the 2007 amendment was void as against public policy. Further, during the plenary hearing on the enforceability of the PMA, plaintiff never asserted that the amendment itself was void for lack of consideration. We refuse to consider that specific argument for the first time on appeal. Selective Ins. Co. of Am. v. Rothman, 208 N.J. 580, 586 (2012).

## III.

We turn to defendant's remaining arguments.

The trial judge awarded the parties joint legal custody and fixed a parenting time schedule that provided plaintiff and defendant equal time with the children during the week. The parties reached an agreement with regard to other parenting time issues.[8] By its terms, paragraph five of the JOD permitted

---

8 The agreement is not in the record.

each party to "tack[]" a week of vacation parenting time onto regularly scheduled parenting time, "thus giving a party more than [seven] consecutive days with the children[.]" The judge rejected defendant's request to permit the consecutive exercise of both weeks of vacation time, finding the children's "frequent contact with both parties, especially based on their young ages[,]" was in their best interests.

Defendant contends the trial judge abused his discretion by requiring the exercise of vacation parenting time in non-consecutive weeks and thereby prohibited defendant from taking the children on vacation to Greece, defendant's ancestral homeland. "An abuse of discretion 'arises when a decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)). Given our highly deferential standard of review, we reject defendant's contention without further discussion. R. 2:11-3(e)(1)(E).

Defendant contends that the trial judge erred by including paragraphs four, five, and eleven in the October 2017 post-judgment order on plaintiff's enforcement motion. The order clarified that each party was responsible for the children's expenses while the children were with them and further required

advance notice to the other party and an itinerary if the children were to be taken out of the tri-state area by car or plane. Defendant also challenges the award of counsel fees to plaintiff in opposing his motion for a stay and in bringing her enforcement motion.

We agree completely with the trial judge's disposition of these two issues and the fee award. The judge's findings about defendant's recalcitrant positions regarding the picayune costs of school lunches and other incidental costs for the children, defendant's continued tack of trying to relitigate child support and his refusal to provide notice regarding the children's out-of-state vacation were all amply supported by the record. Once again, given our standard of review, we have no reason to reverse or even comment further. R. 2:11-3(e)(1)(E).

IV.

To summarize, on plaintiff's cross-appeal, we reverse paragraph 1(a) of the August 2016 order and remand for further proceedings. We reject plaintiff's facial challenge to the elimination of paragraph 23(b)(6) of the PMA being void as against public policy.

As a result, without reaching the merits of plaintiff's remaining argument as to paragraph fourteen of the JOD, and without reaching the merits of defendant's arguments, we vacate paragraphs seven, nine, eleven, twelve and

32

fourteen of the JOD, but stay this portion of our judgment until the trial court's resolution and decision on remand, which may modify as appropriate any of these provisions of the JOD so as to achieve a fair, reasonable and equitable resolution of all financial issues.

We affirm paragraph five of the JOD and the October 2017 order.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION