NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5172-18

MICHAEL C. STEELE,

      Plaintiff-Respondent,

v.

JANE D. MCDONNELL
STEELE,

      Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

April 30, 2021

APPELLATE DIVISION

Argued January 27, 2021 – Decided April 30, 2021

Before Judges Ostrer, Accurso, and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0584-16.

James P. Yudes argued the cause for appellant (James P. Yudes, PC, attorneys; James P. Yudes, of counsel; Kevin Mazza and Elsie Gonzalez, on the briefs).

Thomas D. Baldwin argued the cause for respondent (Chiesa Shahinian & Giantomasi, PC, attorneys; Thomas D. Baldwin, on the brief).

The opinion of the court was delivered by

ENRIGHT, J.A.D.

Defendant Jane D. McDonnell Steele appeals from a declaratory judgment finding the marital agreement (MA) she and plaintiff Michael C. Steele signed after the parties' marriage was a valid, enforceable agreement. Additionally, defendant appeals from the final judgment of divorce (JOD) which incorporated the MA. We conclude the trial court erred by deeming the MA to be in the nature of an enforceable pre-marital agreement. Further, we are convinced the inherently coercive circumstances accompanying the negotiation and execution of the MA here warrant heightened judicial scrutiny to assure it was fair and equitable. We reverse the declaratory judgment and that portion of the JOD which enforced the MA, vacate the denial of defendant's counsel fee request, and remand for further proceedings. Moreover, we identify several factors the trial court should consider on remand when assessing whether to enforce the agreement.

I.

Each party was previously married and divorced before the parties began dating in 1989. Plaintiff had no children from his first marriage; defendant had a son from her prior marriage. Defendant received no financial settlement, aside from child support payments, when she divorced her first husband.

Once the parties' relationship intensified, defendant relocated with her son from California to New Jersey, and the parties began living together in the

2

summer of 1990. During their courtship, plaintiff told defendant, a schoolteacher, that he operated several businesses. Years later, when defendant was asked in her deposition whether plaintiff "came from reasonable wealth" "along the lines of [her] upbringing," defendant answered affirmatively. However, the term, "reasonable wealth," was not defined. Defendant also testified that from the inception of the parties' relationship, plaintiff "never told [her]" "how much money he ma[de]," even though she asked him.

In January 1990, almost two years before the parties' marriage, plaintiff retained a New York law firm to draft a premarital agreement (PMA) for his review. That same month, he received an initial draft of a PMA, which provided that in the event of a divorce, his future ex-spouse would receive $3000 per month in taxable alimony, for the number of months equal to the number of months the parties were married. Approximately one week later, plaintiff's attorney forwarded a revised PMA to plaintiff "with the dollar amounts deleted," which would "enable [plaintiff] . . . to give this to a possible future fiancé[e] without getting into financial details, which vary, of course, with each individual situation." Plaintiff testified that before he proposed to defendant, he did not discuss any terms of a PMA with her.

In January 1991, unbeknownst to defendant, plaintiff's counsel obtained the name of an attorney in New Jersey who could represent defendant in the event a PMA were to be negotiated between the parties. When this referral was provided, the parties were not yet engaged, and there is no evidence plaintiff or his counsel informed defendant of the referral at that time. Nonetheless, plaintiff's attorney wrote to the attorney who provided the referral, stating, "[w]e have recommended the name to a Jane D. McDonnell of Gladstone who we hope will be calling, although it is possible she will retain some other attorney."

Plaintiff's counsel commenced working with plaintiff's accounting employee to draft a financial disclosure statement to accompany a proposed PMA. On January 8, 1991, plaintiff's counsel sent plaintiff a draft financial disclosure statement for his review. The disclosure described plaintiff's six primary assets as follows: (1) more than 96% common stock interest in R. Markey & Sons, Inc., valued at $8,000,000 to $10,000,000 "based on a multiple of 1990 earnings"; (2) an approximate 30% interest in a revocable trust dated February 20, 1978, created by the children of Edward C. Steele, with Edward C. Steele as Trustee, valued at approximately $369,394; (3) an interest in an irrevocable trust dated February 19, 1972, as amended December 20, 1976, holding "extremely valuable" shares of E.C. Steele, Inc.; (4) a 70%

4

interest in a cooperative apartment in New York City, conservatively valued at $225,000; (5) a trust created by Suzanne C. Steele with a fair market value of $60,000; and (6) "other property," including furniture and personal effects not exceeding $50,000. The disclosure statement concluded with the following language:

> In summary, Mr. Steele's personal net worth could be as high (or higher) as $12,000,000 plus a very substantial beneficial interest in the Irrevocable Trust containing stock of E.C. Steele Co., Inc., and containing reinvested dividends from E.C. Steele Co., Inc. These values could go up very substantially over the years. In addition, Mr. Steele has an expectancy of inheriting ultimately very substantial assets from his father and mother.

## II.

Defendant accepted plaintiff's marriage proposal in the spring of 1991. A few weeks after he proposed, plaintiff informed defendant for the first time that he wanted her to sign a PMA. According to plaintiff's deposition testimony, defendant's reaction was "initially negative. She resisted the idea." Plaintiff also testified he had a few more conversations with defendant about signing a PMA but she continued to be unwilling. However, contrary to defendant's testimony, he asserted that sometime between July and September 1991, defendant relented and was willing to sign a PMA. Despite the fact plaintiff had drafts of a PMA and financial disclosure statements, there is

5

nothing in the record to demonstrate he presented defendant with these documents prior to the wedding. In fact, during his deposition, plaintiff specifically was asked if he showed a draft PMA or his prepared financial disclosure statements to defendant prior to the marriage. He answered, "Probably not." He provided the same response when asked if prior to the marriage, he told defendant he had an accountant prepare his financial disclosure statements, or whether he discussed terms he would offer defendant under the PMA.

Defendant testified that when plaintiff first asked her to sign a PMA, he mentioned people "would" or "might" "lose their jobs" if she did not sign the PMA. Plaintiff denied making any such statement. Defendant also testified that after the parties' engagement, plaintiff asked her a number of times to sign a PMA. Defendant declined these requests and recalled that each discussion on this topic lasted for approximately one minute. She viewed the PMA as "this thing that was very distrustful that he wanted to insert into our marriage, and I wanted nothing to do with it." Still, she acknowledged the issue of a PMA "was always there between us" "[w]hether we talked about it or not." She explained that during their brief conversations about the PMA, plaintiff was "at times frustrated, at times angry, and he just got really quiet and wouldn't talk to me, and was clearly upset. And that continued throughout the

6

entire time period while I was being asked to sign this agreement." Neither party asserts plaintiff threatened not to marry defendant if she refused to sign a PMA.

Defendant acknowledged that even though plaintiff did not share information with her about his financial circumstances prior to the marriage, it did not matter to her whether he was "worth a billion [dollars] or worth zero." Defendant testified she did not care "what his economic circumstance was" and she would have married plaintiff "anyway" because the parties "were madly in love."

## III.

Defendant became pregnant in October 1991. The parties arranged to be married in Paris on November 30, 1991. Shortly after the wedding ceremony, plaintiff again requested that defendant sign a PMA. On December 30, 1991, defendant retained the attorney recommended to plaintiff's counsel in January 1991, so the parties could commence negotiating an agreement. Plaintiff received and paid the invoices from defendant's attorney.

Shortly after defendant retained counsel to negotiate the MA, she provided her attorney with an informal accounting of her property and income. On January 23, 1992, defendant's attorney wrote to plaintiff's attorney, requesting changes to what she referred to as the parties' "premarital

7

agreement," even though the parties were married by this time. One of the changes involved increasing the proposed taxable alimony figure from $3000 to $5000 per month for each month the marriage endured, in the event the parties divorced. This requested change was accepted by plaintiff. Also, defendant's attorney asked for the equitable distribution section of the agreement to be modified to reflect that if the parties remained married for over five years, defendant would receive $50,000 versus $35,000 in equitable distribution payments for each year the marriage lasted. Plaintiff rejected this change. Significantly, even though defendant was pregnant when the parties negotiated the terms of the MA, her attorney made no request to modify the proposed MA to include a provision for child support or life insurance for the child's benefit after her birth.

On February 12, 1992, plaintiff's attorney disclosed to defendant's counsel that he "circulated" a "draft premarital agreement" prior to the parties' marriage, but he did not identify who received the draft. The letter also addressed changes to the agreement proposed by defendant's counsel and referred to the parties' draft agreement as the "Steele/McDonnell Marital Agreement." Defendant's attorney then forwarded the letter to defendant for her review. Several weeks later, defendant's attorney wrote to plaintiff's counsel and requested that the MA include a clause confirming, "the parties

A-5172-18

have fully intended at all times to enter into this agreement but were married prior to its execution, and nonetheless desire that the Agreement be executed by them and deemed enforceable in a court of law, consistent with their intentions and wishes." Plaintiff accepted this change.

A revised draft of the MA was submitted to defendant's attorney on April 22, 1992. Although the parties appeared at the office of defendant's attorney in April 1992 to sign the updated MA, the meeting was adjourned after defendant stated she thought she "should ask for something" and her attorney reportedly "threw the question back at" her, responding, "well, what do you want?" Defendant recalled that in this moment, she did not know what she should be "asking for" and that her attorney "was absolutely no help to [her] at all." Defendant later testified she "never felt like [her attorney] was [her] advocate."

Additionally, in April 1992, the parties selected, and plaintiff purchased the parties' first marital home. Plaintiff paid $406,000 for the home, subject to a $170,000 mortgage, and placed title to the marital residence in his name alone.

In early June 1992, plaintiff's attorney revised the financial disclosure statement to accompany the MA and submitted it for review by plaintiff's accounting employee. The updated financial disclosure statement referenced

9

plaintiff's income and seven primary assets, namely: (1) 95.6% interest in the common stock of R. Markey & Sons, Inc., with a "total estimated value of $3.7-4.2 million" based on a "downturn in 1991," together with 21% of the common stock of Keymar, Inc., worth approximately $551,800; (2) 37.4% interest in the Revocable Trust dated February 20, 1978, created by Edward C. Steele, with Edward C. Steele as Trustee, worth approximately $505,000; (3) an interest in the Irrevocable Trust dated February 19, 1972, as amended December 20, 1976, holding the "extremely valuable shares of stock in E.C. Steele Co., Inc."; (4) plaintiff's New York cooperative apartment, which was noted as sold, with the proceeds returned to the Revocable Trust; (5) the trust under the Will of Suzanne C. Steele worth approximately $96,000; (6) whole ownership of Steele Associates, Inc., worth approximately $82,000; and (7) other property including IRAs worth $26,000, securities worth $40,000, personal property not exceeding $125,000 in value, and a home in Far Hills worth $406,000 with a $170,000 mortgage. The updated financial disclosure statement reflected a marked decrease from the first statement as to the value of R. Markey & Sons, Inc. Also, the statement indicated different accounting methods were used to calculate the values of plaintiff's companies and did not reflect plaintiff's companies made certain distributions to him in 1991 totaling over $300,000.

10

In June 1992, plaintiff's attorney forwarded a revised MA to defendant's attorney for her review. On July 10, 1992, plaintiff's attorney forwarded a "final" copy of the MA to plaintiff, asking him to review and sign it. Further, plaintiff's attorney requested that plaintiff deliver his signed copy to defendant for consideration and review with her attorney.

The parties' first child was born in July 1992. When defendant's former counsel was deposed in 2018 about her role in negotiating the terms of the MA, she testified she had no recollection of defendant being pregnant or having any special health problems at that time. Asked if she would have had "concerns about a pregnant woman who's married and about to give birth entering into a post-marital agreement," defendant's former counsel stated, "I think so." Additionally, during the deposition of defendant's former counsel, the following exchange occurred between her and defendant's current counsel:

> Defendant's Current Counsel: Do you have any recollection of this case at all in terms of the parties or what happened in this case?
>
> Defendant's Former Counsel: No.
>
> Defendant's Current Counsel: So when [plaintiff's counsel] asked you what you did or what you didn't do, that's not based upon any recollection of [the] time whatsoever, correct?
>
> Defendant's Former Counsel: Correct.

Defendant's Current Counsel:  It's simply conjecture on your part of what you would have or might have done, correct?

Defendant's Former Counsel:  Correct.

IV.

The parties signed their MA on August 4, 1992.  Defendant testified that when she signed the MA in her attorney's office, she "didn't read the whole thing."  She remembered "looking at . . . Schedule B," which reflected her husband's financial information.  But she testified the MA was "difficult for [her] to understand, and so [she] skipped to the part where it said the $35,000 and the $5,000 a month . . . to make sure it was in there."  Further, she affirmed that when she signed the MA, she was "breastfeeding on demand every two hours, and was completely sleep deprived."  She "decided to sign the agreement to make [her] husband happy."

The MA was executed in four counterparts, and contained Exhibits A and B.  Exhibit A was a single page in length.  It described defendant's financial circumstances, including that she held a one-sixth income interest in a trust, generating $6000 in annual income.  Additionally, the exhibit listed defendant's personal possessions of nominal value, her $10,000 student loan debt, earned income of $1100 per month, and child support of $350 per month for her son from her first marriage.

A-5172-18

In contrast, Exhibit B was seven pages long and outlined plaintiff's assets, liabilities, and income. The exhibit identified his assets as including:

> (1) 95.6% interest in the common stock of R. Markey & Sons, Inc., with a "total estimated value of $3.7-4.2 million" in light of a "downturn in 1991," together with 21% of the common stock of Keymar, Inc., worth approximately $551,800; (2) 37.4% interest in the Revocable Trust dated February 20, 1978, created by Edward C. Steele, with Edward C. Steele as Trustee, worth approximately $505,000; (3) an interest in the Irrevocable Trust dated February 19, 1972, as amended December 20, 1976, holding the "extremely valuable shares of stock in E.C. Steele Co., Inc."; (4) the New York cooperative apartment was noted as sold, with the proceeds returned to the Revocable Trust; (5) the trust under the Will of Suzanne C. Steele worth approximately $96,000; (6) whole ownership of Steele Associates, Inc., worth approximately $82,000; and (7) other property including IRAs worth $26,000, securities worth $40,000, personal property not exceeding $125,000 in value, and a home in Far Hills worth $406,000 with a $170,000 mortgage.

Exhibit B also described plaintiff's personal net worth "as high as $9,000,000 (or higher), plus a very substantial beneficial interest in the Irrevocable Trust." It further stated: "[t]hese values could go up very substantially over the years. In addition, [plaintiff] has an expectancy of inheriting ultimately very substantial assets from his father and mother." Also, Exhibit B reflected plaintiff's estimated income from various sources, including his 1991 salary and bonus, which totaled $184,804. According to defendant, Exhibit B did not reflect all of plaintiff's assets or income, such as

13

"additional distributions" he received from his companies in 1991, and a pension plan from R. Markey & Sons, in which plaintiff held an interest. Nonetheless, the MA confirmed the parties were represented by counsel, were "fully aware of each other's holdings" and "the parties . . . fully intended at all times to enter into this agreement, but were married prior to its execution, and nonetheless desire that the Agreement be executed by them and deemed enforceable." Another clause in the MA stated defendant "declares and acknowledges that [plaintiff] has informed her that his current net worth and other assets and liability, and income are the approximate amount shown on Exhibit B."

Paragraph 7.5 of the MA stated any party who attempted through legal action "to vary the terms of" the MA became liable to pay "liquidated damages" to satisfy the other party's "costs and expenses incurred" to defend against the action. Also, the MA contained a waiver of estate rights, including a waiver of each party's elective share, and stated that "no representations or promises of any kind have been made to [either party] with respect to any bequest, other testamentary benefit or appointment, or beneficial interest of any nature." On the other hand, the MA specified plaintiff would establish an estate plan to effectuate the MA's alimony and equitable distribution

14

provisions "as if the parties' fifth wedding anniversary had already occurred and the marriage had been dissolved thereafter."

The MA further confirmed each party would retain ownership of any separate property, as set forth in Exhibits A and B of the MA. Additionally, paragraph 1.3 of the MA described marital property as property the parties acquired or purchased during the marriage that was owned or jointly held by them. But this paragraph also specified that the term, "marital property," excluded "all real property jointly owned or held that is used . . . for residential or vacation purposes." Therefore, although plaintiff purchased more than one marital home in his name alone, including the home bought before the MA was executed, defendant acquired no interest in same. Moreover, except for a joint bank account used by plaintiff to deposit defendant's monthly allowance, defendant contends no property was purchased or acquired in joint names throughout the parties' twenty-four-year marriage.

The MA also stated if the parties divorced and any child born of or adopted during the marriage had not reached majority, the marital residence would not be sold until the earliest of the following events: all children were emancipated or attained the age of twenty-three, or until the spouse living in the home remarried or cohabited for over thirty days. Importantly, the MA called for the custodial parent who remained in the marital residence to be

15

responsible for all carrying charges on the home. Plaintiff's 2016 Case Information Statement represented the parties' monthly shelter expenses, exclusive of his New York apartment, totaled over $9000.

Under the terms of the MA, if either party filed for divorce after five years of marriage, defendant was entitled to receive equitable distribution payments in the sum of $35,000 for each year of marriage, to be adjusted based on the Consumer Price Index. Defendant was to receive no such equitable distribution payment if either party commenced an action to dissolve the marriage less than five years after the parties wed.

Regarding spousal support, the MA provided that in the event of a divorce, plaintiff would pay defendant taxable alimony of $5000 per month for each month the parties were married, to be adjusted based on the Consumer Price Index. Such payments terminated upon defendant's death, remarriage, or cohabitation. Significantly, defendant was earning $11,000 a year as of June 1992, but stopped working at that time, anticipating the birth of the parties' first child. Therefore, she had no earned income when she signed the MA. She remained at home until 2013 to raise the parties' children.

The MA made no provision for child support or custody, even though the parties' first-born daughter was nearly a month old when the MA was executed. In fact, at Paragraph 5.1, the MA stated:

> Each party acknowledges that no provision has been made herein for the support or custody of children who may be born or adopted into the marriage, and they agree to defer consideration of such support or custody for determination under the circumstances that may exist at such future time as those issues may arise.

According to the deposition testimony of defendant's former counsel, if she knew defendant had just given birth a few weeks before the MA was signed, she would have advised defendant not to sign the MA.

We also observe that paragraph 6.3 of the MA states:

> This Agreement was first presented to [plaintiff] on or about April 24, 1992, and to [defendant] on or about April 30, 1992. <u>Negotiations directly between them and between their respective counsel began before the marriage and continued after their wedding to account for their marital status</u>. Each party acknowledges that he or she has had ample time to consider all of the provisions and consequences of this Agreement and to consult with his or her separate legal counsel.

> [Emphasis added.]

However, negotiations between the parties and their respective counsel did not begin prior to the parties' marriage, and the parties acknowledged as much during their respective depositions. Defendant's former counsel also testified she did not negotiate the terms of the MA before December 1991 and could not have, because she was not retained until that month.

17

## V.

Plaintiff filed a complaint for divorce in December 2015. The parties attempted to mediate their differences but were unsuccessful. In February 2018, plaintiff sought a declaratory judgment to enforce the MA or alternatively, to limit the scope of discovery to issues relating to the formation of, and entry into, the MA, rather than the adequacy of financial disclosure leading to its execution. Defendant filed a cross-motion, opposing enforcement of the MA and asking that it be declared void ab initio; alternatively, defendant sought to compel plaintiff to provide discovery regarding the sufficiency of his financial disclosure when the parties negotiated their MA. By order dated April 19, 2018, the trial court denied plaintiff's motion for a declaratory judgment; determined a plenary hearing was necessary to address the enforceability of the MA; denied plaintiff's request that discovery be limited to "issues relating to the formation and entry into the agreement, but not to the adequacy of financial disclosure"; granted defendant's request that plaintiff comply with discovery, "including with respect to the adequacy of the financial disclosure at the time the parties entered into the agreement"; and ordered broad discovery, so the court could determine "whether defendant voluntarily and knowingly entered into the agreement . . . and [determine] the financial disclosures provided by plaintiff

throughout preparation of the agreement and thereafter." (Emphasis added). The order called for the parties to propound interrogatories and notices to produce, as well as depose each other and fact witnesses.

Both parties moved for reconsideration of this order; their motions were denied on June 15, 2018. By way of a separate order entered the same day, the trial court also denied plaintiff's request for a stay of the denial of his reconsideration request. The judge reasoned, in part, "the relative balance of hardships favors a full and fair hearing with liberal discovery as to the parties' finances, both at the time the parties executed the putative agreement, and presently." (Emphasis added). Both parties moved for leave to appeal.

On August 10, 2018, we granted plaintiff's motion for leave to appeal and denied defendant's cross-motion for leave to appeal. We summarily reversed the June 15, 2018 discovery order "to the extent it provided for broad and liberal pre-plenary hearing discovery." Additionally, we ordered

> the Family Part to enter a modified order limiting pre-plenary hearing discovery to issues relating to the formation and signing of the August 4, 1992 Marital Agreement. Thus, the pre-plenary hearing discovery will address the events, communications, representations, and circumstances - including plaintiff's financial circumstances - at or about the time of the August 4, 1992 Marital Agreement, and relevant matters that preceded the Marital Agreement.

19

Thereafter, the parties engaged in limited discovery, which included their depositions, and the deposition of defendant's former attorney, given her role in negotiating the MA on defendant's behalf.

On April 30, 2019, defendant filed a motion for partial summary judgment, seeking to have the MA deemed a post-nuptial agreement, and adjudicated as void ab initio. Alternatively, she asked that the court render the MA unenforceable, arguing it was inequitable when it was executed since plaintiff "failed to fully disclose his assets at the time of negotiating and entering" the MA. She also contended it was unfair to enforce the MA under her existing circumstances. Parenthetically, the record reflects that when plaintiff initiated divorce proceedings in 2015, defendant had only recently re-entered the job market, her annual earnings were less than $2000, and her earnings were supplemented with dividend income of approximately $16,000 per year.

Plaintiff cross-moved for a declaratory judgment to enforce the MA. The trial court conducted oral argument on the cross applications on May 31, 2019, during which plaintiff's counsel argued, "[t]here can be no reasonable question that this is, as I've characterized it, a premarital agreement disguised as a marital agreement, only by virtue of the timing." At the conclusion of the hearing, the judge reserved his decision.

On June 28, 2019, the judge denied defendant's motion, and granted plaintiff's cross-motion. In his lengthy written opinion, the judge found the MA was akin to a PMA and enforceable. He acknowledged plaintiff's position that the MA "constitutes a premarital agreement," "[d]espite the signing of the agreement subsequent to the date of marriage." Further, the judge identified 201 paragraphs of undisputed facts taken "verbatim" from the parties' submissions and found these facts were "not in dispute between the parties and are sufficient to decide the case." Considering these facts, the judge analyzed the definition of a premarital or pre-civil union agreement, as defined by the 2013 version of the Uniform Premarital and Pre-Civil Union Agreement Act (Act), N.J.S.A. 37:2-31 to -41.[1] He observed N.J.S.A. 37:2-32 defined a premarital or pre-civil union agreement as "an agreement between <u>prospective spouses</u> or partners in a civil union couple <u>made in contemplation of marriage</u> or a civil union and <u>to be effective upon marriage</u> or upon the parties establishing a civil union." (Emphasis added).

The judge then distinguished the parties' MA from the mid-marriage agreement referenced in <u>Pacelli v. Pacelli</u>, 319 N.J. Super. 185 (App. Div. 1999). He concluded that unlike the wife in <u>Pacelli</u> who was presented with a

---

[1] Reference to pre-civil union agreements was added to the short title in 2006. <u>See</u> L. 2006, c. 103, § 26.

mid-marriage agreement on a "take it or leave it" basis, here "some form of a marital agreement was contemplated" by defendant prior to the parties' marriage, and she was able to negotiate an "upward adjustment in her entitlement" under the MA. He also compared defendant's circumstances to those set forth in an unpublished appellate decision, which he found to be "extremely similar" to the instant matter. The judge noted that in the unpublished case, we found the agreement to be an enforceable PMA due to the "relatively brief time which ha[d] elapsed since the parties['] nuptials." Accordingly, the judge "adopt[ed] the same view," and found the MA in the instant matter was similar to a PMA and enforceable. He stated,

> in the present set of circumstances, the only thing that appears to have prevented these parties from entering into the agreement prior to marriage is that defendant became pregnant with their first child. Subsequent to the birth of the child, almost immediately thereafter, the parties signed and entered into the Marital Agreement.

The judge also rejected defendant's claim that plaintiff fraudulently withheld financial information from her or that she was under duress when she signed the MA. On the other hand, the judge found plaintiff "used before-tax figures for some of his businesses and after-tax figures with regard to other businesses. This affected his disclosure of income and valuations in his businesses, resulting in differences of millions of dollars that he avoided

22

disclosing." (Emphasis added). Additionally, the judge found the MA did "not disclose . . . the value of plaintiff's share of the irrevocable trust dated February 18, 1972, as amended December 20, 1976." Still, the judge determined plaintiff did not knowingly undervalue his assets to avoid fully disclosing material information to defendant. Further, the judge determined defendant failed to "ask questions or retain a financial expert" so the impact of plaintiff's disclosures was "significantly offset by her lackluster desire" to ascertain the true extent of plaintiff's finances. Moreover, the judge concluded defendant did not demonstrate she relied on plaintiff's disclosures, since she admitted in her deposition she read very little of the agreement, including Schedule B. Also, the judge found defendant signed the MA "endorsing her support that whatever disclosure was provided was sufficient to her," and he concluded her previous counsel "obtained positive results" for her, including "more favorable alimony and equitable distribution" provisions in the MA.

VI.

On appeal, defendant offers the following arguments for our consideration:

POINT I

THE TRIAL COURT ERRED AS A MATTER OF LAW IN DETERMINING THAT THE AUGUST 4, 1992 AGREEMENT WAS A PREMARITAL AGREEMENT, AND AS SUCH ITS GRANTING OF

23

DECLARATORY JUDGMENT TO THE PLAINTIFF AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE MUST BE REVERSED.

A. THE TRIAL COURT ERRED BY IGNORING THE LIMITS OF [ITS] AUTHORITY AS DETERMINED BY THE LEGISLATURE IN ESTABLISHING THAT A PRENUPTIAL AGREEMENT MUST BE ENTERED INTO PRIOR TO A PARTIES['] MARRIAGE, AND VOIDED LEGISLATIVE INTENT.

B. THE TRIAL COURT ERRED IN RELYING UPON AN UNREPORTED DECISION WHICH WAS NOT CONTROLLING AND CLEARLY DISTINGUISHABLE AS PRECEDENT IN MAKING [ITS] DETERMINATION THAT THE AUGUST 4, 1992 AGREEMENT WAS PREMARITAL.

## POINT II

BESIDES ITS ERROR IN RELYING UPON THE UNPUBLISHED . . . CASE IN FINDING THE AGREEMENT TO BE PREMARITAL, THE TRIAL COURT FAILED TO APPLY THE CORRECT STATUTE IN ENFORCING SAME.

## POINT III

THE TRIAL COURT ALSO COMMITTED REVERSIBLE ERROR BY FAILING TO MAKE FINDINGS OF FACT REGARDING THE ENFORCEABILITY OF A PRENUPTIAL AGREEMENT UNDER THE ACT.

24

POINT IV

THE TRIAL COURT ERRED AS A MATTER OF LAW IN REFUSING TO RECOGNIZE THE PARTIES' AUGUST 4, 1992 AGREEMENT AS A POSTNUPTIAL OR MID-MARRIAGE AGREEMENT, AND IN SO DOING THE DIFFERING STANDARD GOVERNING THEIR ENFORCEABILITY.

POINT V

THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT'S REQUEST FOR FINDING AS A MATTER OF LAW THAT THE AUGUST 4, 1992 MARITAL AGREEMENT WAS VOID AB INITIO AND/OR NOT FAIR AND EQUITABLE AT THE TIME [] ENFORCEMENT WAS SOUGHT.

POINT VI

THE TRIAL COURT ERRED IN ESSENTIALLY GRANTING SUMMARY JUDGMENT IN FAVOR OF THE PLAINTIFF WHEN THERE WERE MATERIAL FACTS IN CONTROVERSY.

POINT VII

THE TRIAL COURT ERRED IN FAILING TO AWARD COUNSEL FEES TO THE DEFENDANT.

As a threshold matter, we agree with the contentions raised by defendant in Points I, II and IV. Accordingly, we remand this case for further proceedings and discovery consistent with this opinion, and are satisfied we need not reach the arguments raised in Points III and VI. To the extent defendant contends in Point V that the trial court erred in failing to recognize

25

the parties' MA was void ab initio, we find this argument unpersuasive for the reasons set forth herein.

We review summary judgment using the same standard that governs the trial court. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). As the parties agreed on the material facts for purposes of the motion, our task is limited to determining whether the trial court's ruling on the law was correct. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Relevant New Jersey caselaw typically references three types of marital agreements, namely PMAs, mid-marriage agreements, and property settlement agreements. We acknowledge the circumstances surrounding the execution of the MA make it somewhat difficult to conclude it belongs in any of these three categories. But ultimately, we are persuaded under the totality of circumstances, the parties' MA deserves the heightened scrutiny we have applied to mid-marriage agreements, as in Pacelli. Much like other agreements between partners or spouses, the MA need not bear a specific label for us to address its enforceability.

Ordinarily, "[p]re-nuptial agreements establishing post-divorce obligations and rights should be held valid and enforceable." Hawxhurst v. Hawxhurst, 318 N.J. Super. 72, 80 (App. Div. 1998) (citing Marschall v.

26

<u>Marschall</u>, 195 N.J. Super. 16, 27 (Ch. Div. 1984)). Such agreements made in contemplation of marriage are enforceable if they are fair and just. <u>Pacelli</u>, 319 N.J. Super. at 189; <u>DeLorean v. DeLorean</u>, 211 N.J. Super. 432, 435 (Ch. Div. 1986); <u>Marschall</u>, 195 N.J. Super. at 28, 31. The public policy supporting enforcement of a pre-nuptial, as opposed to a post-nuptial, agreement is that one party remains free to walk away before the marriage takes place. <u>Pacelli</u>, 319 N.J. Super. at 189-90, 195. Still, unconscionable PMAs are not enforceable. <u>Rogers v. Gordon</u>, 404 N.J. Super. 213, 219 (App. Div. 2008) (quoting <u>Marschall</u>, 195 N.J. Super. at 29-31).

Conversely, mid-marriage agreements are generally unenforceable as they are "inherently coercive." <u>Pacelli</u>, 319 N.J. Super. at 191. A mid-marriage agreement is "entered into before the marriage [has] lost all of its vitality and when at least one of the parties, without reservation, want[s] the marriage to survive." <u>Id.</u> at 190-91. Such agreements are carefully reviewed because they are "pregnant with the opportunity for one party to use the threat of dissolution 'to bargain themselves into positions of advantage.'" <u>Id.</u> at 195 (citation omitted).

Property settlement agreements generally are enforceable, so long as they are "fair and equitable," as they assume the parties stand in adversarial positions and negotiate in their own self-interest. <u>Lepis v. Lepis</u>, 83 N.J. 139,

27

148-49 (1980). Property settlement agreements are prepared in contemplation of divorce, "when relations have already deteriorated. Discovery is available, parties usually deal at arms length and the proceeding - almost by definition is adversarial." Marschall, 195 N.J. Super. at 29.

Given these legal precepts, we are persuaded the trial court mistakenly found the MA was in the nature of a PMA and enforceable under the 2013 version of the Act to enforce it. In reaching this conclusion, we note when we conducted oral argument, plaintiff's counsel promptly conceded the MA was not a premarital agreement. Additionally, the MA simply is not a PMA, given that the Act defines a premarital agreement as "an agreement between prospective spouses … made in contemplation of marriage … and to be effective upon marriage." N.J.S.A. 37:2-32 (emphasis added). Further, the MA was not "in the nature of a PMA" as argued by plaintiff, because it was not negotiated and executed under the circumstances common to actual PMAs. Indeed, the parties could have, but did not negotiate or execute the MA upon their engagement, or when defendant became pregnant. This is significant because prior to the parties' engagement, plaintiff already had worked with counsel to prepare more than one draft of a PMA and, with the assistance of an accounting employee, had prepared financial disclosure statements. Also, almost a year before the parties married, plaintiff obtained a referral for an

attorney he thought could assist defendant in negotiating an agreement. Yet, plaintiff did not submit a draft PMA or draft financial disclosure statement to defendant for her review, nor reveal the name of the attorney referred to him until after the parties married. Further, defendant did not retain counsel to assist her in negotiating the terms of the MA until about a month after the wedding. Also, the first time defendant saw a draft of the MA, she was well into her pregnancy, and it was not until several months after the parties married and purchased a home that they signed the MA. Because the MA was neither a PMA nor in the nature of one, it is not entitled to any presumption in favor of enforceability. Even if the MA qualified as a PMA, which it does not, the 2013 iteration of the Act would not have governed its enforceability, given its effective date; instead the 1988 version of the Act would have applied to a PMA executed in 1992. The language of the 1988 version allowed for a separate determination of whether a premarital agreement is unconscionable, apart from reasons established in its subsections. By comparison, the 2013 version of the statute only allowed for a determination of unconscionability for the reasons established in its subsections.

We also are convinced the parties' MA does not qualify as a property settlement agreement. Plainly, it was not executed in contemplation of a

29

divorce, whereby each party's economic rights would be fixed upon the entry of a divorce judgment.

The parties' MA also differs somewhat from the mid-marriage agreement referenced in Pacelli. In Pacelli, the parties had been married for ten years and had two children when the husband informed his wife "he would divorce her unless she agreed to certain terms regarding their economic relationship. To punctuate his demand, [the husband] moved out of the marital bedroom and into an apartment above their garage." Pacelli, 319 N.J. Super. at 187. The wife wanted to "preserve the marriage and did not want her children to grow up in a broken family," so she signed the mid-marriage agreement contrary to her attorney's advice. Id. at 188.

Unlike the scenario in Pacelli, here, neither party was threatened with divorce or separation to prompt the execution of a marital agreement. Instead, both parties were happily married when they negotiated and signed their agreement. Even defendant's counsel admitted during oral argument on May 31, 2019, as he argued in favor of summary judgment, this case was "not [like] Pacelli because they were both happily married and testified to that."

Nevertheless, defendant, like the wife in Pacelli, already had entered the legal relationship of marriage when she signed the MA. She also had left her teaching job and given birth to the parties' daughter a mere few weeks prior to

30

signing the MA. Defendant's former counsel had no recollection of defendant being pregnant or having any special health problems at the time the agreement was executed, but in her deposition, she testified she thought she would have had "concerns about a pregnant woman who's married and about to give birth entering into a post-marital agreement."

Additionally, when defendant recalled her circumstances at the time the MA was executed, she testified, "[a]sking me to sign the agreement three weeks after our child was born felt a little confrontational and opportunistic." Further, as already mentioned, she stated that after she gave birth, but before she signed the MA, plaintiff was "at times frustrated, at times angry, and he just got really quiet and wouldn't talk to me and was clearly upset. And that continued throughout the entire time period while I was being asked to sign this agreement." Believing there were consequences to not signing the MA, defendant explained there was the "possibility that I could become incredibly vulnerable without support, being a mother of two children. Additionally, she testified:

> I felt tremendous pressure by him. I felt like he was never ever going to let it go. That it was just going to go on and on and on, and it would always be there, and he would always be coming to me and pressuring me to sign the agreement.

31

Under these circumstances, we have little difficulty concluding the parties' MA is in the nature of a mid-marriage agreement and deserves heightened scrutiny. Certainly, just as in the Pacelli case, there was a marriage and a family to preserve. Moreover, though the purported pressure placed on defendant differs from the tactics employed by the husband in Pacelli, plaintiff's insistence on having defendant execute the MA months after the marriage, so soon after the birth of the parties' daughter and while she was unemployed, appears to be "inherently coercive." At that point, defendant was not free to just walk away.

Despite the contextual differences between the various types of agreements, our jurisprudence makes clear the parties' MA, much like other mid-marriage agreements, as well as prenuptial or property settlement agreements, is not enforceable if it is not fair and equitable. However, unlike PMAs or property settlement agreements, we do not approach the question of whether a mid-marriage agreement is enforceable with a predisposition in favor of its enforceability, given the "inherently coercive" nature of mid-marriage agreements.

Marital agreements "involve far more than economic factors and must serve the strong public and statutory purposes of ensuring fairness and equity in dissolution of marriages." Conforti v. Guliadis, 128 N.J. 318, 323 (1992)

32

(internal quotation marks and citations omitted).  But any marital agreement that is unconscionable or the product of fraud or overreaching, particularly where it exploits the confidential relationship between spouses, may be set aside.  Massar v. Massar, 279 N.J. Super. 89, 93 (App. Div. 1995); Guglielmo v. Guglielmo, 253 N.J. Super. 531, 541 (App. Div. 1992).

Further, a settlement agreement "will be reformed . . . where a party demonstrates that the agreement is plagued by 'unconscionability, fraud, or overreaching in the negotiations of the settlement.'"  Weishaus v. Weishaus, 180 N.J. 131, 143-44 (2004) (quoting Miller v. Miller, 160 N.J. 408, 419 (1999)).  Accordingly, a trial court has a "duty to scrutinize marital agreements for fairness."  Dworkin v. Dworkin, 217 N.J. Super. 518, 523 (App. Div. 1987).  In doing so, a court must

> must consider issues such as the adequacy of the agreement at [its] inception, the presumed understanding of the parties at that time, the reasonable expectation of the parties during the life of the agreement, [and] the manner in which the parties acted and relied on the agreement.
>
> [Glass v. Glass, 366 N.J. Super. 357, 372 (App. Div. 2004) (citing Konzelman v. Konzelman, 158 N.J. 185, 193 (1999)).]

This court has recognized that "[i]nterpretation and construction of a contract is a matter of law for the court subject to de novo review."  Fastenberg v. Prudential Ins. Co. of Am., 309 N.J. Super. 415, 420 (App. Div.

1998) (citing <u>Bradford v. Kupper Assocs.</u>, 283 N.J. Super. 556, 583 (App. Div. 1995)). That said, "[t]he law grants particular leniency to agreements made in the domestic arena," thus allowing "judges greater discretion when interpreting such agreements." <u>Guglielmo</u>, 253 N.J. Super. at 542 (citing N.J.S.A. 2A:34-23).

We have long recognized that a family court is a court of equity, where judges employ a "full range" of equitable doctrines to deal with matrimonial controversies. <u>See</u> <u>Kazin v Kazin</u>, 81 N.J. 85, 94 (1979). Divorce agreements are necessarily infused with equitable considerations and are construed in light of salient legal and policy concerns. <u>Konzelman</u>, 158 N.J. at 194 (citing <u>Petersen</u>, 85 N.J. at 642). The interpretation, application, and enforceability of divorce agreements are not governed solely by contract law. <u>Ibid.</u> "[C]ontract principles have little place in the law of domestic relations . . . . Thus, settlement agreements, if found to be fair and just, are specifically enforceable in equity. <u>Ibid.</u> (citations omitted).

Although we are not persuaded defendant was under duress when she signed the MA, our review of the MA and the circumstances surrounding its execution suggest the MA may have been unfair, if not unconscionable, when it was executed, and when plaintiff moved to enforce it. Our concerns pertain to three areas: the adequacy of plaintiff's financial disclosures before the

parties signed the MA; the circumstances surrounding the MA's negotiation and execution; and the adequacy of the settlement itself.

Regarding the sufficiency of plaintiff's disclosures before the MA was executed, we note first, as the judge observed, the MA did not disclose the value of plaintiff's share of the irrevocable trust dated February 18, 1972. Second, different methods were used to value plaintiff's businesses, which, as the trial court found, resulted in "millions of dollars that he avoided disclosing." Third, defendant contends plaintiff had an interest in a pension plan that was not disclosed in the MA at Exhibit B. We are mindful plaintiff does not deny this claim. Moreover, his 2016 Case Information Statement plainly lists an "R. Markey & Son Defined Benefit pension" with the explanation that he "began participating in the pension on January 1, 1983" and it is "exempt as per marital agreement." Defendant also suggests plaintiff enjoyed additional income from his business interests which was not disclosed in Exhibit B. Given these facts, if the remand court concludes plaintiff significantly underreported his income or net worth prior to the execution of the MA, agreement, the mere fact he disclosed other assets and income on Exhibit B would not militate in favor of enforcement of the MA. A

> right in question "can properly be considered 'known'
> only if there is full awareness of the other party's
> income and assets, since those facts are critical
> elements in determining the potential awards of

35

alimony and equitable distribution which the signer of the agreement is being asked to waive.'"

[Orgler v. Orgler, 237 N.J. Super. 342, 349 (App. Div. 1989) (quoting Marschall, 195 N.J. Super. at 32).]

As to the circumstances resulting in the execution of the agreement, we already have addressed defendant's resistance to signing a PMA before the parties' marriage, her belief plaintiff was "never ever going to let [his request for an agreement] go," and her feelings of vulnerability when plaintiff persisted in his request to have defendant sign the MA after the parties were married, bought a home, had a child, and defendant was unemployed. We also do not ignore defendant's testimony that she signed the MA to "make [plaintiff] happy," at a time when she was "breastfeeding on demand every two hours, and was completely sleep deprived."

On the other hand, we recognize defendant testified she "[d]idn't care one way or the other what Mr. Steele's economic disclosure was in schedule B" as "it wasn't important to her." Defendant testified it did not matter to her whether plaintiff had a "billion dollars a year in income or zero dollars a year in income." Further, she confirmed she "didn't care one way or the other what [plaintiff's] economic circumstance was" and "would have married him anyway" because the parties "were madly in love." These facts also must be considered when assessing the enforceability of the MA.

A-5172-18

Ultimately, to the extent defendant had a limited understanding of the terms of the MA or its consequences once she was married, we are satisfied her mindset did not relieve plaintiff of his obligation to treat defendant fairly. To hold otherwise would effectively lead to ignoring defendant's contributions as a spouse, parent, "homemaker and helpmate" and inequitably "preclude her participation in post-agreement wealth." Pacelli, 319 N.J. Super. at 198.

Regarding the adequacy of the settlement itself, we observe the MA did not acknowledge the existence of, or provide for the support of, the parties' infant child, let alone health or life insurance coverage or other support-related obligations for her benefit. Further, the MA required a waiver of defendant's apparently extremely valuable elective share. Additionally, although defendant stopped working two months before the MA was executed, in anticipation of raising the parties' newborn daughter, the MA made no provision for defendant to receive equitable distribution unless the parties remained married for more than five years. Also, defendant is sixty-two years old and has reported minimal earnings after being absent from the job market from 1992 to 2013. The record is devoid of any indication she can enjoy any semblance of the marital lifestyle, notwithstanding the taxable and non-taxable distributions due her under the MA.

A-5172-18

Therefore, we reverse the declaratory judgment and that portion of the JOD which enforced the MA. On remand, we direct the trial court to employ heightened scrutiny and review the MA for fundamental fairness, with particular consideration to be paid to the concerns we have raised. Specifically, the court shall consider the adequacy of plaintiff's pre-execution financial disclosure; the circumstances surrounding the MA's negotiation and execution; and the adequacy of the settlement itself. In anticipation of this remand hearing, we lift our prior order limiting the scope of discovery so that the parties can pursue discovery regarding their financial circumstances both at the time they executed the agreement, and when plaintiff sought to enforce the MA.

We turn next to defendant's contention that the trial court erred in denying her request for counsel fees in conjunction with its entry of the JOD on June 28, 2019. An award of counsel fees in matrimonial matters is discretionary. R. 5:3-5(c); Williams v. Williams, 59 N.J. 229, 233 (1971). We will not disturb a counsel fee decision absent a showing of "an abuse of discretion involving a clear error in judgment." Tannen v. Tannen, 416 N.J. Super. 248, 285 (App. Div. 2010). An abuse of discretion occurs when a trial court makes "findings inconsistent with or unsupported by competent evidence," utilizes "irrelevant or inappropriate factors," or "fail[s] to consider

controlling legal principles." Elrom v. Elrom, 439 N.J. Super. 424, 434 (App. Div. 2015) (citations omitted). An abuse of discretion is also demonstrated if the court fails to consider "all relevant factors." Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005) (citing Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

Rule 4:42-9(a)(1) permits the trial court to award counsel fees in a family action pursuant to Rule 5:3-5(c). Rule 5:3-5(c) lists various factors the trial court should consider in deciding whether to award a party counsel fees. It is well established that

> in awarding counsel fees, the court must consider whether the party requesting the fees is in financial need; whether the party against whom the fees are sought has the ability to pay; the good or bad faith of either party in pursuing or defending the action; the nature and extent of the services rendered; and the reasonableness of the fees.
>
> [Mani v. Mani, 183 N.J. 70, 94-95 (2005) (emphasis omitted) (citations omitted).]

Here, we cannot discern the extent to which these factors were considered or if the factors were discounted based on the judge's decision to enforce the MA under the Act. What is evident, however, is that the judge referenced Rules 4:42-9(b), 5:3-5(c) and New Jersey Rules of Professional Conduct (RPC) 1.5(a) in denying both parties' counsel fee requests, but he did not fully explain how the factors set forth in these Rules impacted his decision.

39

Instead, he succinctly stated in his June 28, 2019 opinion:

> The court finds that the fees presented by counsel are reasonable and made in good faith. In addition, the court finds that the submissions made by both parties in this matter were made in good faith. As a result, there is no award of counsel fees in connection with this current motion. The parties are responsible for their own fees and costs.

We are persuaded these findings fall short of what is required under the Court Rules.

Additionally, we note that although the judge decided to enforce the MA, he did not enforce paragraph 7.5 of the MA, which called for the party seeking to vary the terms of the MA to pay, as liquidated damages, "all costs and expenses incurred by the other party in defense" of the MA. Although such "costs and expenses" presumably would have included plaintiff's counsel fees in this action, the judge did not compel defendant to absorb plaintiff's counsel fees. Given what appears to be a significant discrepancy in the parties' earnings and assets, we do not take issue with this result, nor does plaintiff cross appeal from the denial of counsel fees. However, given our discussion about the circumstances under which a marital agreement should be enforced, we direct the trial court to scrutinize for fairness the contents of paragraph 7.5, along with the balance of the MA's provisions.

Accordingly, we vacate the June 28, 2019 denial of defendant's request for counsel fees and remand for reconsideration of this issue, in tandem with the remand court's consideration of the validity and fairness of the MA. Any review of defendant's request for counsel fees should follow the Rules of Court and RPC 1.5(a), so that her financial circumstances and ability to pay her own fees are considered, along with plaintiff's ability to contribute to her fees.

Finally, because the judge who heard this matter already conscientiously expressed his opinion about the fairness of the MA, we are persuaded that to preserve the appearance of a fair and unprejudiced hearing, it would be prudent for another judge to preside over this matter on remand. See Pressler & Verniero, Current N.J. Court Rules, cmt. 4 on R. 1:12-1(d).

The declaratory judgment is reversed, the portion of the JOD which enforced the MA is vacated, the denial of defendant's counsel fee request is vacated, and the matter is remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5172-18